### TERRITORY *v.* MURRAY ET AL.

*Facts held not to constitute a wager or contempt of court.* — In the proceeding at bar, against one Murray and one Murphy for an alleged contempt of the supreme court, the facts were as follows: Certain cases known as the Smokehouse cases had been decided favorably to Murray, who was a party thereto, and certain other actions in which he was also interested, involving the same questions, were pending before the court. Murphy offered to bet Murray that the supreme court would reverse their former decisions, whereupon Murray, without the knowledge of Murphy, gave another person the money to make the bet, and instructed him to have Murphy make the bet as his agent. The bet was accordingly made, Murray being the actual owner of all the money wagered. *Held,* that the facts aforesaid constituted no genuine wager, and that consequently Murphy was not guilty of a contempt. The court declined to pass upon the question of whether or not the making of a wager upon the decision of a suit pending before a court is a contempt.

*Facts decided to constitute a contempt of the supreme court.* — It further appeared in the cause at bar that, after the procurement of the bogus bet aforesaid, Murray caused a telegram to be printed in a newspaper published at at the city of Helena, in which the supreme court was then in session, that a bet had been made between certain parties in Butte, that owing to the influence of certain persons interested in the cases then pending, the supreme court would reverse their former decisions in the Smokehouse cases. *Held,* Murray's conduct was a contempt of court at common law.

*Testimony of a defendant as to his intent, in a proceeding instituted against him for contempt of court, held not conclusive.* — The defendant Murray swore in an affidavit and upon the witness-stand that he had no intention of treating the court with contempt in publishing said telegram: *held,* that the court is not bound by his denial, but may inquire into the truth of the matter.

*Territorial courts are not United States courts.* — *Held,* that the territorial courts are not United States courts, within the meaning of section 725 of the Revised Statutes of the United States, which defines the power of United States courts to punish for contempt; and that said statute does not apply to the territorial courts, even under that provision of the organic act of Montana Territory which declares "that the constitution and laws of the United States which are not locally inapplicable shall have the same force and effect within the said territory of Montana as elsewhere in the United States."

*Section 566, subdivision 1, division 1, Revised Statutes of Montana (sec. 584, subd. 1, div. 1, Comp. Stats. Mont.), relating to contempt of court, construed.* — *Held,* that the conduct of Murray, as hereinbefore described, is within the statute defining contempts of court, and their punishment.

A PROCEEDING before the supreme court for contempt of that body.

SANDERS, CULLEN, & SANDERS, for the court.

TOOLE & WALLACE, for defendant Murray.

No briefs filed.

THE opinion states the case.

McCONNELL, C. J.   This is a case of contempt arising in this court.   The subject-matter of the contempt is stated in the warrant of arrest of the defendants, as follows, to wit: "Whereas, at a former term of this court, certain causes depending therein, and known as the Smokehouse cases, involving title to real property in the city of Butte, Montana Territory, have been determined; and whereas, at the present term of said court, the tenth and eleventh days of January, 1887, certain other cases involving title to certain real estate in said city of Butte, based substantially on the same claims as the said former cases, were depending and standing for decision, and were also known as the Smokehouse cases; and whereas, it further appears that one James A. Murray, of said Butte City, January 10, 1887, did make a certain wager on the decision of this court of said Smokehouse cases then depending, with one James W. Murphy, and with him did bet that the said supreme court would not reverse their former decision in said cases; and whereas, it further appears that the said James A. Murray did publish and utter, and cause to be published and uttered, in a newspaper of general circulation, to wit, the Helena Independent, on the eleventh day of January, A. D. 1887, at Helena, Montana, the following dispatch, to wit: 'Cannon & Murphy, real estate agents, to-day made a wager of five hundred dollars that, owing to the influence of some surface claimants on the Smokehouse lode, the supreme court would reverse their former decision in the Smokehouse case.'"

There are two grounds of contempt set out in said warrant.   One is the making of a wager or bet upon the

decision of the suit then pending before this court, and the other is the publication of the telegram by defendant Murray.

2. From the agreed statement of facts filed by counsel, and the affidavits and other testimony heard in the cause, the following facts appear, to wit: That, as set forth in the warrant of arrest, there were certain cases pending in this court at the time of the publication of the telegram, and that there had been certain other cases heard and disposed of at a former term of this court, of substantially the same kind, all known as the Smokehouse cases (6 Mont. 397); that the defendant Murray was the plaintiff in said cases, and as to those disposed of he had been successful; that he claimed the lots in controversy under a mining right, and defendants to said suits were claimants to the surface of the same lots; that he had gained his suits as to some of the claimants, but as to others they were pending for trial before the court then in session; that, in a conversation between the defendants in this proceeding, Murphy told Murray that he thought the supreme court would reverse its former decision; that there would be more influence and new points in the case, and that he had learned this from the attorneys of the claimants; he further said that he could get money to bet on the case. And it also further appeared that Murray agreed to take the bet, and that he gave one Jolly $250 to give to Murphy, with which to make the bet, and after Murphy had received the money thus furnished by Murray himself, they made the wager, and placed the money in the hands of one Lowery, as stakeholder. It appears that Murray was the owner of all the money, and, in point of fact, Murphy had no interest whatever in the wager, for it was Murray betting with himself, through a secret understanding with Jolly. Murphy thought he was making a genuine wager for Jolly, and is chargeable with whatever moral delin-

quency that may attach to such intent. But as Murray had agreed with Jolly that he should not lose the money, and had furnished it himself, there was no wager, and hence Murphy is not guilty of making any wager, as charged in the warrant, and must be discharged. So, likewise, must Murray be discharged, so far as this branch of the case is concerned; and we need not pass upon the question whether the making a wager upon the decision of a suit pending before a court is a contempt of court.

3. It further appeared that Murray did prepare, and cause to be published, the telegram as set out in the warrant. This presents a much graver question for our consideration. The defendant disclaims in his affidavit any intention to treat the court with the slightest contempt in publishing said telegram; but the court is not bound by such disclaimer, but may inquire into the truth of the matter. " The meaning and intent of the defendant in publishing the dispatch must be determined by a fair interpretation of the language used." " The construction and tendency of the publication, as bearing upon its character as a contempt, are matters of law for the court." *Henry* v. *Ellis*, 49 Iowa, 205; *People* v. *Wilson*, 64 Ill. 195; and also numerous authorities cited in the latter case.

The defendant says in his affidavit that in making the publication in the Independent, he "intended no disrespect or improper conduct towards the court; but, on the contrary, was prompted solely to so publish the same as an item of news, and apprise the court of what had transpired, that it might act in the premises as it saw proper." He further says that Murphy and Cannon were copartners in the real estate business, and on that account interested in having the surface claimants succeed in said cases; that Murphy stated to him, in substance and effect, the facts published in the Inde-

pendent, and he was thus informed of the wager at the time he sent the dispatch. On the hearing of this cause, the defendant voluntarily put himself upon the witness-stand, and, among other things, swore that his object in sending that telegram was "to have the thing generally discussed, to have a chance to make wagers, as he was satisfied the decision would not be reversed." He further discloses the fact that Cannon and Murphy had made no wager at all, but that he had procured a simulated one to be made.

It is seldom we find as many contradictions and as much falsehood in so short a record as the case before us contains. The dispatch itself is false. Cannon and Murphy had made no wager. Murphy had not informed him of the wager; he knew all about it himself. He says his sole purpose was to publish it as an item of news, and apprise the court of what had transpired, that it might act in the premises as it saw proper. Then, again, he says his purpose was to have the matter generally discussed, that he might have a chance to make wagers on the decision. We do not believe that any of the reasons given is the true one; but we will consider what the motive was. In the conversation he had with Murphy, the latter had told him that the counsel for the claimants in the Smokehouse cases had developed some new points that he believed would cause the court to decide his suits then pending before it against him. In this is to be found the real motive that moved the defendant to send the telegram. In the words, "that, owing to the influence of some surface claimants on the Smokehouse lode, the supreme court would reverse its former decision," lurks the insinuation that undue influence was being brought to bear upon the court by his adversaries in said suits. He expected in this way to make the public believe that Cannon & Murphy, a firm of real estate dealers in the city of Butte, would not

make a wager of five hundred dollars that some of the
" surface claimants " would so influence the court that it
would reverse its former decision without having strong
grounds for believing it was true. He intended, by
sending the telegram to the Independent, and publish-
ing it in the city where the court was then sitting, to
reach the court. He says himself, in his affidavit, that
his purpose was to apprise the court of what had trans-
pired, that it might act in the premises as it saw proper.
He fabricated a falsehood, attributed it to other parties,
and published it, to apprise the court of what had trans-
pired,—to influence its decision in the suits then pend-
ing before it in which he was a party. He hoped, by
informing the judges that it was believed that the defend-
ants to the suits in which he was plaintiff were bringing
influence to bear upon them so that they would reverse
their former decision, to make them feel that they could
not afford to do so, lest it would be said of them by the
public that they had been induced by corruption to
make such decision. His purpose to reach each one of
the judges, and to influence him to stand firm in his
former holding, is as obvious as if he had sent the
dispatch to each of them personally, instead of publish-
ing it in a newspaper, where he knew they were bound
to read it. If the telegram had been true, he might
have been excused upon the ground of an honest mo-
tive. But what could have induced him to manufacture
a falsehood, and send it, but a corrupt motive to influ-
ence the court? Must a court that sits to try causes be
insulted by the very parties to the suits which they are
trying, by a covert and cowardly insinuation of official
corruption, and have no power to punish such parties
for contempt? To deprive them of such power is to
take away from them the right of judicial self-defense.
There can be no doubt but that his conduct is a con-
tempt of court at common law.

Mr. Bishop, in his work on criminal law, volume 2, section 245, says: "And according to the general doctrine, any publication, whether by parties or strangers, relating to a cause in court, if it has a tendency to prejudice the public respecting its merits, and to corrupt the administration of justice, . . . . may be visited as a contempt." In 2 Hawk. P. C. 220, contempts are classified as contempts in the face of the court, and comtemptuous words or writings concerning the court. Blackstone says contempts may be committed " by speaking or writing contemptuously of the court, or judges acting in their judicial capacity, . . . . and by anything, in short, that demonstrates a gross want of that regard and respect which, when once courts of justice are deprived of, their authority is entirely lost among the people." 4 Cooley's Bla. Com. 285. The supreme court of Illinois has defined contempts to be " direct," such as are offered in the presence of the court while sitting judicially, or " constructive," such, though not in its presence, as tend by their operation to obstruct and embarrass or prevent the due administration of justice. *Stuart* v. *People*, 3 Scam. 395. And in this case the court held that such acts would be considered as done in its presence. Courts are organized for the administration of justice, and the whole doctrine of contempt grows out of the necessity of removing every obstruction in its way, by visiting summary punishment upon those who undertake to defeat it. The right to punish for contempt is inherent in all courts of justice. It is a part of their very life, and a necessary incident to the exercise of judicial power. *United States* v. *New Bedford Bridge*, 1 Wood. & M. 407; *State* v. *Johnson*, 1 Brev. 155; *Yates* v. *Lansing*, 9 Johns. 416; *Casat* v. *State*, 40 Ark. 514; *United States* v. *Hudson*, 7 Cranch, 32; *State* v. *Doty*, 90 Am. Dec. 674.

In the case of *Stuart* v. *People*, 3 Scam. 395, the supreme court of Illinois say that " in the class of con-

structive contempts would necessarily be included all acts calculated to impede, embarrass, or obstruct the court in the administration of justice." Such acts would be considered as done in the presence of the court. Contempts committed out of the court's presence are often held to have been constructively committed in its presence. It makes no difference whether the defendant was in Butte or Helena, in the court-house in the presence of the court, or out of it, when he published the obnoxious dispatch, the authority to punish for it is equally clear at common law. Upon the right to punish for constructive contempts in England and America, see *Respublica* v. *Passmore*, 3 Yeates, 441; *Respublica* v. *Oswald*, 1 Dall. 319; *Masters* v. *Edwards*, 1 Caines, 515; *Tenney's Case*, 3 Fost. 162. In the case of *Neel* v. *State*, 50 Am. Dec. 209, the court say: " This power extends at common law, not only to acts which directly and openly insult or resist the power of the court, or the purposes of the judges, but to consequential, indirect, and constructive contempts, which obstruct the process, degrade the authority, or contaminate the purity of the court."

But we are met at the threshold of this discussion with the contention that this court has no power to punish for this contempt, for want of jurisdiction. This objection is founded upon the idea that the act of Congress of March 2, 1831, carried into the Revised Statutes, section 725, applies to this court. Said statute provides that the United States courts "shall have power . . . . to punish, by fine or imprisonment, at the discretion of the court, contempts of their authority; provided, that such power to punish contempts shall not be construed to extend to any cases, except to misbehavior of any person in their presence, or so near thereto as to obstruct the administration of justice, the misbehavior of any of the officers of said court in their official transactions, and the disobedience or resistance of any such

officer, or by any party, juror, witness, or other person to any lawful writ, process, order, rule, decree, or command of the said courts." The contempt under consideration does not come within the classes enumerated in the statute just quoted; hence if this court is a United States court, within the meaning of this statute, it has no jurisdiction to punish the defendant for said contempt. We do not think this statute embraces the territorial court. It applies to the courts of the United States alone. In the case of *Clinton* v. *Englebrecht,* 13 Wall. 447, the supreme court of the United States say: "The judges of the supreme court of the territory are appointed by the President, under the act of Congress; but this does not make the courts they are authorized to hold courts of the United States. This was decided long since in *Insurance Co.* v. *Canter,* 1 Pet. 546, and in the later case of *Benner* v. *Porter,* 9 How. 235. There is nothing in the constitution which would prevent Congress from conferring the jurisdiction which they exercise, if the judges were elected by the people of the territory and commissioned by the governor. They might be clothed with the same authority to decide all cases arising under the constitution and laws of the United States, subject to the same revision. Indeed, it can hardly be supposed that the earliest territorial courts did not decide such questions, although there was no express provision to that effect, as we have already seen, until a comparatively recent period. There is no supreme court of the United States, in the sense of the constitution, in the territory of Utah. The judges are not appointed for the same terms, nor is the jurisdiction which they exercise part of the judicial power conferred by the constitution or the general government. The courts are the legislative courts of the territory, created in virtue of the clause which authorizes Congress to make all needful rules and regulations re-

specting the territories belonging to the United States."
This case arose in the territory of Utah, upon the question whether a jury had been obtained in a lawful manner. The district judge had them summoned under an act of Congress prescribing the manner in which the United States courts should be governed in the selection of jurors. · The district judge acted upon the theory that supreme and district courts of the territories were courts of the United States, and summoned the jury by an open *venire,* as required by said act of Congress. This the supreme court of the United States held to be error, for the reasons given in the extract from the opinion given above. We think it clear that Congress never intended to embrace the territorial courts in the act of March 2, 1831, above quoted. *United States* v. *Beebe,* 2 Dak. 298.

But we are met with the further objection that said statute regarding contempts is in force in this territory, under that provision of the organic act which declares "that the constitution and laws of the United States which are not locally inapplicable shall have the same force and effect within the said territory of Montana as elsewhere in the United States," and it may be insisted that, under this clause, the act of March 2, 1831, is applicable to the territorial courts. In the case of *Hornbuckle* v. *Toombs,* 18 Wall. 654, the supreme court of the United States say that "it is argued, by virtue of this enactment, all regulations respecting judicial proceedings which are contained in any of the acts of Congress are imported into the practice of the territorial courts. This proposition is not tenable. . . . . That clause has the effect, undoubtedly, of importing into the territory the laws passed by Congress to prevent and punish offenses against the revenue, the mail service, and other laws of a general character and universal application, but not those of specific application. The act of March

2, 1831, has a specific application to the courts of the United States by its very terms, and is not of universal application, and cannot be made to apply to the territorial courts under said clause of said organic act." The supreme court, in the same case, further say: "Whenever Congress has proceeded to organize a government for any of the territories, it has merely instituted a general system of courts therefor, and has committed to the territorial assembly full power, subject to a few specified or implied conditions, of supplying all details of legislation necessary to put the system into operation, even to the defining of the jurisdiction of the several courts. As a general thing, subject to the general scheme of local government chalked out by the organic act, and such special provisions as are contained therein, the local legislature has been intrusted with the enactment of the entire system of municipal law, subject also, however, to the right of Congress to revise, alter, and revoke at its discretion. The powers thus exercised by the territorial legislatures are nearly as extensive as those exercised by any state legislature. . . . . In fine, territorial, like state courts, are invested with plenary municipal jurisdiction."

But the supreme court of the United States have held, in substance, that the territorial legislatures may limit the common-law jurisdiction of this court to punish for contempts. We must then examine this question, and ascertain whether this has been done. Section 566, division 1, Code of Civil Procedure, declares that the following acts or omissions, in respect to a court of justice, or proceedings therein, are contempts of the authority of the court. Then follow twelve enumerations of the different kinds of acts or omissions which constitute punishable contempts. There is nothing in the statute that intimates that those enumerated are all the acts or omissions which are contempts of the authority of the court. If any part of the statute embraces the acts un-

der consideration, it is the first, which says: "Disorderly, contemptuous, or insolent behavior towards the judge while holding court, tending to interrupt the due course of a trial, or other judicial proceeding." In Hawkins's definition of contempts, given *supra,* he classifies them as contempts in the face of the court, and contemptuous words or writings concerning the court. Blackstone says they may be committed in the face of the court, or by speaking or writing contemptuously of the court, or the judges acting in their judicial capacity.

The statute says, contemptuous behavior towards the judge while holding court, tending to interrupt the due course of a trial, or other judicial proceeding. It nowhere provides that this contemptuous behavior towards the judge shall be in his presence. If defendant had written a letter to the judges, and charged them with corruption, and handed it to them while on the bench, no one would pretend to doubt that this would come within the statute. But suppose he had mailed such a letter to them in the city of Butte, and it had reached them by due course of mail, would not this be as much calculated to interrupt the due course of a trial as if he had handed it to them in person? Would it not have been as much contemptuous behavior towards the court as the former would have been? And wherein would this behavior towards the judges differ in principle, or in the degree of contempt it shows for them, from sending the obnoxious telegram to the newspapers, to not only reach them, but to publish it to the world at the same time? It seems to us that for a party to a case in court to do this is contemptuous, and an insolent behavior towards the judges holding court, tending to interrupt the due course of a trial or other judicial proceeding. This construction of the statute makes it embrace the whole of the common law on the subject of contempts. To limit it by construction to behavior

done in the presence of the court, or so near as to interrupt it, would be to add to the provisions of the statutes a modification which the legislature did not attach to it, and to present the legislative anomaly of an act simply declaratory of the common law, less one of its provisions, without the slightest hint that it was the intention of the legislature to repeal such provision.   To so construe it as to make it embrace all the common law, would be to make the statute but a codification of the common law.   Perhaps it may be contended that the expression of one thing is the exclusion of another, and the leaving out of the statute one provision of the common law is the exclusion or repeal of it.   Mr. Bishop, in his work on statutory crimes, says, section 131, that " when the unwritten and the written law, the same as when two statutes, may stand together without conflict up to a given point, there is not properly a repeal."   But we need not discuss this, as we hold that the case under consideration comes within the provision of the statute. We think, then, that the statute "but affirms a principle inherent in a court of justice, to defend itself when attacked, as the individual man has the right to do for his own preservation. . . . . The statute merely affirms a pre-existent power, and does not attempt to restrict its exercise to contempts in the presence of the court, but leaves them to be determined by the principles of the common law."

We therefore find the defendant, James A. Murray, guilty of contempt as charged in the second allegation in the warrant, and we assess his punishment by a fine of five hundred dollars.

We desire to thank the counsel who has so ably conducted the case as *amicus curiæ.*

McLEARY, J., GALBRAITH, J., and BACH, J., concur.