## JOSEPH A. DUFFY v. THOMAS P. McKENNA.

Argued June 7, 1911—Decided January 11, 1912.

1. An amendment of the declaration after the statute of limitations has run—*Held,* not improper so long as a new cause of action is not introduced thereby.

2. The circumstances found to have existed in this case with regard to the custody and deliberations of the jury—*Held,* not to be such as to vitiate the verdict.

3. The action was for deceit in the sale of certain stock and bond privileges. Plaintiff did not receive the property but paid part of the purchase price on account in exchange for a broker's receipt agreeing to deliver the privileges on payment of the balance with interest. Before the balance was paid he discovered that false representations as to the bonds had been made and demanded his money back, and not receiving it, brought suit for damages on account of the false representations. *Held,* that the

measure of damages was the difference between what he had paid and the value of what he had at the time of discovering the fraud, and in the absence of all evidence as to the value of the broker's receipt a verdict for nominal damages should have been directed.

On defendant's rule to show cause.

Before GUMMERE, CHIEF JUSTICE, and Justices PARKER and VOORHEES.

For the plaintiff, *Roe & Runyon.*

For the defendant, *Collins & Corbin.*

The opinion of the court was delivered by

PARKER, J. This is an action of deceit. The plaintiff has twice had a verdict, the second time by a struck jury.

The declaration was originally in three counts, but the third count was struck out, and at the second trial, the proceedings at which are now before us, the case under the second count was withdrawn from the jury. The verdict under review therefore rests on the first count alone.

Two questions of practice are presented. It is urged in the first place that there was error in permitting an amendment of the first count shortly before the trial, and that this introduced substantially a new cause of action after the period of limitation had expired. The representations averred to have been made by defendant, according to the first count in its original form, are—*first,* that the North American Lumber and Pulp Company was a New Jersey corporation; *second,* that defendant was its president; *third,* that it was possessed of two hundred and fifty-five thousand acres of land in Canada; *fourth,* bringing in a revenue of $40,000 a year over expenses; *fifth,* that said company had issued two hundred bonds of $1,000 each, secured by mortgage covering said property; *sixth,* which bonds were valid, existing obligations of said company and worth their face value; *seventh,* and that defendant was going to invest $14,000 in these bonds, and his

father $5,000 in them. The representations averred to have been false by the count as originally drawn were those relating to the ownership of land and the revenue therefrom, numbered three and four above. By the amendment that numbered five was also traversed as false.

We think it is plain that no new cause of action was introduced by this additional matter. The basis of the plaintiff's suit was that he had been induced by this series of representations to invest $10,000 of his money in partial payment for twenty "allotments," each consisting of one bond and twenty shares of the stock of the said company, which he would not have done unless he had relied on these representations as true. The fact that one more representation is branded as false by the amendment would seem merely to strengthen the plaintiff's case without adding any further cause of action.

It is further urged that there was misconduct on the part of the jury or of the clerk and officers in charge of them, which vitiates the verdict. There is some little conflict as to the facts, but we find that what occurred was about this: when the jury was sent out, a constable was sworn in open court. The judge left for the day, after directing the clerk to take the verdict. Then the constable was relieved by another one sworn in the clerk's office. This was irregular, but furnishes no sufficient reason for setting aside the verdict. Afterwards the jury sent out word that they wished further instructions, and word was sent back that the judge was gone. It was then after six o'clock, and the clerk, through the constable in charge, notified the jury that he was going to supper, and that if they were not ready with the verdict they would not be able to report until his return at seven-thirty; thereupon the foreman sent out word that they were nearly ready and asked if he would wait ten or fifteen minutes after six-thirty, to which he assented, and in a few minutes the jury came in.

There is nothing in all this to show intentional misconduct on the part of either the jury or the court officers, or that any improper influence was exerted to induce a verdict. In *Baizley* v. *Welsh*, 42 *Vroom* 471, members of the jury were allowed to leave the jury room and telephone to their families,

but this was held no cause for setting aside the verdict. We see none in the present case, so far as the custody and conduct of the jury are concerned.

This brings us to the merits of the case. Duffy, McKenna, one O'Reilly, McKenna's brother-in-law, and a broker named Meyer, had been more or less intimate both socially and in a business way. Duffy held receipts entitling him to stock in a corporation called the Dominion Securities Company. His testimony, which the jury evidently believed, is that on March 27th, 1902, McKenna telephoned him to bring over his receipts to New York, and 'he did so; that McKenna then told him to sell out and buy bonds and stock of the North American Lumber and Pulp Company; that he asked what it was all about, and that the representations were then made. Accordingly, Duffy sold out his Dominion securities stock for about $13,000, paid $10,000 of the proceeds to Meyer and received a receipt as follows:

NEW YORK, March 27th, 1902.

"This is to certify that I have this day received from Joseph A. Duffy ten thousand dollars on account of the purchase of twenty allotments of the stock and bonds of the North American Lumber and Pulp Company, each allotment consisting of one bond and twenty shares of stock of said company, which said allotments are deposited with me subject to the payment of the balance of the purchase thereof of ten thousand dollars with interest.

"A. L. MEYER."

This receipt is all that Duffy ever got for his money. It turned out afterwards that because of legal difficulties connected with the holding of Canadian real estate by a New Jersey corporation, the promoters, McKenna and others, had arranged that the title should be vested in, and the bonds issued by, a Canadian corporation called the United Lumber Company, Limited, that the North American company was the holding company for these bonds, and that it was the bonds of the United Lumber Company that Duffy was ex-

pected to take when he should pay the balance on his "allotments." There are prospectuses in evidence which indicate that this arrangement was perfected before Duffy came into the matter at all, but he denies that he knew anything about it. According to his story he waited until October, after trying ineffectually to get his bonds from Meyer, and being offered instead bonds of the South Elberon Land Company, and then demanded his money back from McKenna but failed to obtain it.

The defendant urges that the court should have nonsuited or directed a verdict for defendant, but the case was clearly not one for either of these dispositions. It is obvious from what has been said that it was open to the jury to find that Duffy was induced to pay out his money for something that he did not get, and in the nature of things could not get because it was not in existence, to wit, bonds of the North American Lumber and Pulp Company. It is no answer to say that the United Lumber Company bonds were just as good; for irrespective of the reason that they were not what were bargained for, Duffy might well refuse to take bonds of a Canadian company, of whose rights and powers he knew little or nothing, instead of bonds of a New Jersey corporation, with respect to whose validity he, being a New Jersey lawyer, could judge for himself. It is said that the receipt may be construed to call for United lumber bonds. This would be a very strained construction, to say the least, but conceding it could be so construed, the meaning of the receipt was left to the jury as requested by defendant.

We find nothing in the various arguments made by counsel and elaborated in the brief to lead to the conclusion that any harmful legal error was committed at the trial except in the refusal of one of defendant's requests to charge. As has already been noted, Duffy having paid in $10,000 on account of a $20,000 purchase, received Meyer's receipt calling for stock and bonds of the North American Lumber and Pulp Company, deliverable on payment of the other $10,000 and interest. The stock was obtainable, but not the bonds, be-

cause such bonds did not exist.   On discovery of the fraud, Duffy might have tendered back the receipt and sued for the return of his money as money had and received to his use. This, however, he did not do, but retained the receipt without paying in the balance called for thereby until it was made worthless by an enforced sale of his privileges thereunder in the following January; and his present suit is for the damage done him by the false representations.   The rule of damages in such case as laid down by the Court of Errors and Appeals, is that the damage is the difference between the price paid by the purchaser and the real value of the property that he has acquired.   *Crater* v. *Binninger,* 4 *Vroom* 513, 516; and the time as of which this difference is to be ascertained is when the fraud ceased to be operative.   *Smith* v. *Duffy,* 28 *Id.* 679, 690.   That juncture in the case at bar was in September or October, 1902, when Duffy learned the bonds were not forthcoming.   Hence the damages would be the difference between the $10,000 paid and the value of Meyer's receipt at that time, disregarding questions of interest.   But there is not a particle of proof in the case as to the value of this receipt held by Duffy, or that he made any effort to dispose of it then or thereafter.   That the allotment privileges which it represented were of some value is indicated by the sale of twenty allotments in the following January for a total of $11,800, after the securities had greatly depreciated—a sum that would have covered the unpaid balance called for by Duffy's receipt with the interest (about $450), and have repaid him some $1,350 on account of his claim.

It is true that Duffy did not have the formal allotment privileges, but only Meyer's receipt for $10,000 and agreement to deliver them on payment of the balance.   But this was a contract, with a broker in active business and presumably solvent and responsible.   It is not intimated that the allotments would not have been forthcoming on payment of the balance; and the sale of stock privileges in financial districts is so common that in all likelihood the Meyer receipt at the time in question had some value.   The trial court sub-

stantially recognized this in laying down the measure of damages, but failed to observe that there was no evidence at all as to the value of the receipt. Such evidence it was the duty of Duffy to provide in order to prove his case; and without it there was no means of applying the proper rule of damages. The court was requested to charge that the verdict should be only for nominal damages. The request, in view of this failure of evidence, should have been granted. Without this evidence the verdict rests on no lawful foundation and cannot stand.

For this reason the rule to show cause will be made absolute.