DOYLE, Respondent, *v.* UNION BANK & TRUST CO., Appellant.

(No. 7,488.)

(Submitted February 10, 1936.   Decided March 4, 1936.)

[59 Pac. (2d) 1171.]

564

*Messrs. Gunn, Rasch, Hall & Gunn,* for Appellant, submitted a brief; *Mr. M. S. Gunn* argued the cause orally.

566

*Mr. Wellington D. Rankin* and *Mr. Arthur P. Acher,* for
Respondent, submitted a brief and argued the cause orally.

MR. JUSTICE ANDERSON delivered the opinion of the court.

This was an action to recover damages which the plaintiff alleges she suffered by reason of the purchase of a $1,000 debenture bond from the defendant early in the month of November, 1929.

The complaint was in two counts. The first count was on the theory of fraud and deceit; the second was on the theory of breach of warranty in the sale of personal property. The facts alleged in the two counts were identical, with the exception of such allegations as were necessary to develop the particular theory of liability therein alleged. The answer denied all of the allegations of the complaint, aside from those which were introductory in character.

The cause was tried before the court sitting with a jury. At the close of the evidence defendant moved for a directed verdict on the ground, in effect, that plaintiff had failed to prove any damage. The motion was denied. The cause was submitted to the jury and a verdict was returned for the sum of $910, the price paid by plaintiff for the bond. A judgment was entered on the verdict, and the appeal is from the judgment. By appropriate specifications of error defendant seeks a review of the ruling of the trial court denying its motion for a directed verdict.

Early in the month of November, 1929, plaintiff purchased from the defendant a certain Insull Utilities Investment Company debenture, Series A, of a par value of $1,000, bearing interest at 5 per cent., payable semi-annually on February 1st and August 1st, dated January 1, 1929, and due January 1, 1949, for the sum of $910. Her allegations as to the false and fraudulent representations and warranties were as follows: "That the aforesaid security was a secured bond; that it was just as good as a $1,000 bill; that the holder thereof had a first mortgage on the property of all of the utility and power companies in Chicago, Illinois; that the security thereof was the same as if the holder thereof had a first mortgage upon all

of the property of the Montana Power Company; that said bond was secured by property of a value of four or five times the value of the bonds outstanding; that said debenture was a safe investment."

Evidence was produced in support of these allegations on behalf of the plaintiff, and on behalf of the defendant denying the truth of the same. It is conceded that the verdict of the jury is conclusive on the question of the fraudulent representations. It was stipulated on the trial that the Insull Utilities Investments, Inc., was incorporated in the state of Illinois to carry on an investment business and to acquire, hold, sell and underwrite securities of all kinds; that the debenture was not at any time secured by a mortgage; that the company covenanted not to mortgage or pledge any of its assets without equally and ratably securing this debenture with other obligations secured, or to be secured, by such mortgage or pledge, except that the company could mortgage or pledge its assets for the purpose of securing loans in the usual course of business for a period not exceeding one year. The corporation went into receivership in the federal court in the state of Illinois in April, 1932, and failed to pay interest maturing on August 1, 1932. The debenture was in default as to subsequent payments of interest. The undisputed evidence in the record is that the debenture, at the time plaintiff purchased it, had a market value equivalent to the amount she paid for it, and continued to have such market value for some time after its purchase. It was testified that at the time of the trial the market value of this debenture was from $17.50 to $20, and that on January 1, 1929, the company had total assets in excess of $29,000,000 and outstanding debentures to the amount of $6,000,000. The next statement published by the company as of December 31, 1929, showed total assets of $161,000,000, and liabilities of $55,000,000. It further appeared in the testimony that the assets and liabilities in the month of November, 1929, were approximately the same as of the date of December 31, 1929. The issue of the debentures of which the

one involved in this case was a part, amounted to $6,000,000 originally, but at the time of the purchase the amount outstanding was $2,489,000. The gross earnings of the company, as reported for the year 1929, were $12,387,974, and the actual interest payments were $769,228. Reports disclose that in 1932 the total assets of the company were $27,000,000, and the total liabilities $148,000,000.

It was testified by persons who qualified as experts that in the month of November, 1929, at the time the bond was sold to plaintiff in this case, in their opinion the price paid was the fair value for it at that time. It appears from the record that plaintiff purchased the bond for investment and not for purposes of speculation, and that she did not discover the falsity of the representations until some time in the year 1934.

Defendant argues that the proof of plaintiff is lacking in two particulars, namely, that she failed to prove the actual value of the debenture at the time of the sale, and likewise the value which the debenture would have had if it had been as represented.

Under some authorities, the measure of damages under each of the causes of action set forth in the complaint is the same. This court, in the case of *Healy* v. *Ginoff*, 69 Mont. 116, 220 Pac. 539, said that the measure of damages for fraud inducing the purchase of property is "the difference between the actual value of the property at the date of sale and the contract price." In the case of *Rickards* v. *Aultman & Taylor Machinery Co.*, 64 Mont. 394, 210 Pac. 82, it was said that the measure of damages for breach of a warranty in the sale of personal property was the difference between the value of the thing sold if it had been as warranted, and its actual value at the time of the sale. The trial court instructed the jury that the measure of damages was the difference between the value of the debenture which plaintiff obtained and the value that debenture would have been had it been as represented.

Plaintiff contends that the evidence was sufficient to go to the jury, in that the market value at the time of the purchase

was some evidence of what the value of the debenture would have been had it been as represented; that since she bought the debenture for purposes of investment and not speculation, the jury was entitled to consider subsequent developments, and that these developments sufficiently proved that the debenture was worthless at the time of its purchase.

The price paid for property is generally held to be strong, but not conclusive, evidence of what the value of the property would have been if as represented. (12 R. C. L. 453; *Reeser* v. *Hammond*, 122 Kan. 695, 253 Pac. 233; *Divani* v. *Donovan*, 214 Cal. 447, 6 Pac. (2d) 247.) We think that the evidence of the market value was sufficient to take the case to the jury upon the question of what the value would have been if the debenture had been as represented.

The decided cases are in conflict on the question of what is the measure of damages in cases of fraud and deceit in the case of corporate stocks and bonds. Many of them adhere to the rule as announced by this court in *Healy* v. *Ginoff*, supra; many others, as applied to this particular type of case, have adopted the rule as announced in *Rickards* v. *Aultman & Taylor Machinery Co.*, supra. They are collected in the note to 57 A. L. R. 1142. It will be noted that under either rule the formula for the computation of the damages uses an identical subtrahend, namely, the actual value of the thing sold at the time of the sale. We direct our attention to this situation, as we shall presently cite cases from jurisdictions adopting either one or the other of these rules on the question of the sufficiency of the proof to establish the actual value of the debenture at the time of the sale.

Some courts hold that the market value of the stock at or about the time of sale is evidence bearing on the question of its real value, although not necessarily conclusive. (*Warner* v. *Benjamin*, 89 Wis. 290, 62 N. W. 179, and *Ford* v. *H. W. Dubiskie & Co.*, 105 Conn. 572, 136 Atl. 560.) If we adopt this rule and consider only the testimony as to the market

value, plaintiff suffered no damage, for it was undisputed that she purchased the debenture at the market value.

Plaintiff contends that in cases such as is here presented, █ where a bond, debenture or corporate stock is bought for purposes of investment and not speculation, the actual value of the corporate security controls the market value, and that the jury were at liberty to take subsequent events into account in arriving at the actual value of the debenture. Thus far many decided cases support this contention, among which are the following: *Whiting* v. *Price,* 172 Mass. 240, 51 N. E. 1084, 1085, 70 Am. St. Rep. 262; *Hindman* v. *First National Bank,* (C. C. A.) 112 Fed. 931, 57 L. R. A. 108; *Morrow* v. *Franklin,* 289 Mo. 549, 233 S. W. 224; *Paul* v. *Cameron,* 127 Neb. 510, 256 N. W. 11; *Hotaling* v. *A. B. Leach & Co.,* 247 N. Y. 84, 159 N. E. 870, 871, 57 A. L. R. 1136; *Cramer* v. *Overfield,* 115 Kan. 580, 223 Pac. 1100; *Davis* v. *Coshnear,* 129 Me. 334, 151 Atl. 725. The reason for this rule is that, as said in the case of *Whiting* v. *Price,* supra, "the market value of the bond at the time of the sale may have been illusory, because the public also may have been deceived." To the same effect is the case of *Hindman* v. *First National Bank,* supra, and *Shwab* v. *Walters,* 147 Tenn. 638, 251 S. W. 42. An additional reason is that of the manipulation of stock and bond transactions on the market which sometimes affect the market price. (*Otis & Co.* v. *Grimes,* 97 Colo. 219, 48 Pac. (2d) 788.) If the market value at the time of the sale is an unsafe guide as to the actual value of corporate security, it must logically follow that the market value some three years or more later is likewise no evidence of the actual value at the time of the sale. If an optomistic market value is unsound, then a depressed market value is no better.

The right of the jury to consider the subsequent developments in arriving at the actual value of the thing sold was held to be proper in the cases cited, supra, but in none of them, with possibly one exception, was the question of the sufficiency of the evidence to go to the jury on the question of

the actual value of the property solely upon subsequent developments, standing alone, considered by the courts. In the *Whiting* v. *Price* and *Hindman* v. *First National Bank Cases*, supra, the question considered was the propriety of instructions informing the jury that, in determining the actual value of the thing sold at the time of the sale, they might take into account what had happened since the purchase. In the cases of *Morrow* v. *Franklin* and *Paul* v. *Cameron*, supra, it was held that the testimony of subsequent developments was admissible for the consideration of the jury. In *Cramer* v. *Overfield* and *Davis* v. *Coshnear*, supra, other evidence as to the actual value was before the jury for consideration in addition to that of subsequent developments. In *Hotaling* v. *A. B. Leach & Co.*, cited supra, it was said: ''The defendants should not be held liable for any part of plaintiff's loss caused by subsequent events not connected with such fraud.'' After this statement, the court said: ''The loss proximately caused by the defendant's fraud is the difference between the price he paid and the value of what he received when put to the use contemplated by the parties. In this case that value must be determined in the light of subsequent events. As long as the fraud continued to operate and to induce the continued holding of the bond, all loss flowing naturally from that fraud may be regarded as its proximate result.'' However, the facts in that case are distinguishable from those under consideration here. There the plaintiff had purchased a corporate bond secured by a mortgage. The mortgage had been foreclosed, the property sold and every conceivable asset of the corporation to which the plaintiff might have looked for payment of the bond had been exhausted. In the light of those facts and circumstances, the New York court made the pronouncement quoted supra. Here, so far as the record is concerned, plaintiff has filed her claim with the receiver; as to what she will ultimately realize is pure speculation. The only proof of subsequent developments relates to the following facts: The appointment of a receiver in 1932, the default in the payment of interest in August, 1932,

the unexplained decline in the assets, and the increase in the liabilities of the company in its statement of 1932, as compared to that of December 31, 1929, and the testimony as to market value heretofore discussed.

We have found no case which holds directly that proof of subsequent developments, standing alone, is sufficient to prove the actual value of the thing sold at the time of the sale, unless it is the New York case which we have already discussed.

In the case of *Davidter* v. *Ash,* 264 Mich. 353, 249 N. W. 866, the court in its opinion said: "Plaintiff has appealed from judgment on verdict directed in an action for damages for fraud in the sale of securities. The measure of damages in such case is the difference at time of sale in value of the securities as they were represented and as they were. On this matter plaintiff was put to proof and failed; the only evidence worthy of note being that some months later a receiver was appointed for the corporation issuing the securities. This was insufficient to support an assessment of damages, as the trial court correctly held."

In *Dyer* v. *Hunter,* 133 Cal. App. 267, 23 Pac. (2d) 1049, 1050, the court said: "It follows that there were no pleadings, evidence, or findings before the trial court upon which to base a finding or conclusion that any damage had been suffered by plaintiff at the time of her purchase of the stock. Nor will the evidence that the stock subsequently became valueless supply this defect. It is elemental that proof of damage is necessary to establish a cause of action for fraud."

In the case of *Heidegger* v. *Burg,* 137 Minn. 53, 162 N. W. 889, 890, it is written: "But there was another issue in the case, that of whether plaintiff was damaged, and, if so, to what extent. This issue necessarily involved an inquiry as to the value of the stock at the time of the trade. It fairly enough appeared that some fifteen months afterwards the Furniture Company went out of business, and the Peck Company went into liquidation, and that the stock of both corporations was then worth less than par, if it was worth anything, but we

search the record in vain for any competent evidence that the stock was not worth par at the time it was sold to plaintiff, or, if not, how much less than par it was worth. Plaintiff failed to compel the production of the books of the corporations, and the evidence of the witnesses called to testify to the value of assets, the liabilities and the value of the stock, if competent at all, was so wanting in probative force and so unsatisfactory that we cannot permit a verdict based on such testimony to stand. We need hardly say that the condition of the corporations a year and more after the transaction, not shown to have existed at that time, or to be due to causes then existing, was not evidence that had any tendency to prove the value of the stock at the time of the transaction.'' In fact, it is generally held that proof of subsequent events or developments tending to establish that a corporate stock or bond is valueless is insufficient to prove that the thing sold was worthless at the time of the previous sale, particularly where the corporation at the time of the sale had property. (*Kinnear* v. *Prows*, 81 Utah, 135, 16 Pac. (2d) 1094; *Kuehl* v. *Parmenter*, 195 Iowa, 497, 192 N. W. 429; *North American etc. Assn.* v. *Phillips*, 94 Colo. 554, 31 Pac. (2d) 492; *Morrell* v. *Wiley*, 119 Conn. 578, 178 Atl. 121; *Duffy* v. *McKenna*, 82 N. J. L. 62, 81 Atl. 1101; *Gunderson* v. *Havana-Clyde Min. Co.*, 22 N. D. 329, 133 N. W. 554.)

As we view the situation here, there was no proof before the court as to what the actual value of the debenture might have been at the time of the sale.

It is argued on behalf of the plaintiff that to compel her to ▮▮ offer some proof as to the actual value of the thing sold at the time of the sale is tantamount to denying to her the right of recovery. The question of the actual value of the debenture was something on which expert witnesses could have expressed an opinion. However, plaintiff's remedy by way of an action for damages was not the only remedy available to plaintiff, if she was defrauded. On discovering the alleged fraud, by offering to restore the property purchased, she

would have been entitled, if she could have maintained her allegations as to fraud, to a return of the consideration for the purchase, without any proof as to the actual value of the debenture at the time of the sale; however, she elected to retain the debenture and sue for damages.

No evidence being present in the record as to the actual value of the debenture at the time of the sale, the trial court was in error in denying defendant's motion for a directed verdict. The judgment is reversed and the cause remanded to the district court with direction to enter a judgment of dismissal.

ASSOCIATE JUSTICES MATTHEWS, STEWART and MORRIS concur.

MR. CHIEF JUSTICE SANDS, Dissenting: This action was brought by plaintiff, Julia Doyle, against the Union Bank & Trust Company for damages sustained by her in the purchase of an Insull Utilities Investment Company $1,000 par value debenture from the defendant bank. She purchaser the debenture in November, 1929, for $910. By its terms it became due January 1, 1949, with an annual interest at 5 per cent. The Insull Company defaulted in its interest payments in February, 1932, went into a receivership in April, 1932, and at the time of the trial it appeared that the debenture had a par value of $1,000, but could be sold for $1.75, or at most not over $20.

The complaint charges that Schuyler, the manager of the bond department of the defendant bank, induced Mrs. Doyle to purchase the debenture by making false representations and warranties as to its character and value. It was admitted in the pleadings that the bank had for many years represented to the public that it was able and willing to advise its customers respecting investment problems. Mr. Schuyler admitted that he understood Mrs. Doyle was purchasing the debenture for an investment, that she was a long time customer of the bank and reposed great confidence in the bank. It is conceded that

there was ample proof to show that Mrs. Doyle was induced to purchase the debenture in reliance upon the representations and assurances of Schuyler, shown to be false and fraudulent.

The jury was instructed that the measure of damages in the case was as follows: ''Instruction No. 17. You are instructed that if you find for the plaintiff, then your verdict should be for the amount that would compenstate her for the difference between the value of the debenture she obtained and what the value of that debenture would have been, had it been as represented.''

I cannot subscribe to the opinion of the majority that there was not sufficient evidence in the record to support the finding of the jury that the debenture was in fact worthless at the time Mrs. Doyle bought it. Subsequent developments have proven that the debenture in this case is worthless, or practically so, as an investment for which purpose she expressly purchased it, and the jury had a right to infer the debenture had no greater value when it was sold to Mrs. Doyle. As the court said in *Hotaling* v. *A. B. Leach & Co.*, 247 N. Y. 84, 159 N. E. 870, 871, 57 A. L. R. 1138, 1141: ''The only question we are asked to consider is whether the correct measure of damages was applied. The damages awarded must represent the loss which the plaintiff sustained through the purchase and continued ownership of the bond. In return for the bond he gave up the sum of $980. He bought for investment, not speculation. * * * Subsequent increase or decrease of value might bring profit or loss to the buyer, but such profit or loss would be the result of subsequent events and of choice by the buyer whether to hold or sell. It would not be the direct result of the seller's wrong nor increase or diminish his liability. * * * The loss proximately caused by the defendant's fraud is the difference between the price he paid and the value of what he received when put to the use contemplated by the parties. In this case that value must be determined in the light of subsequent events. As long as the fraud continued to operate and to induce the continued holding of the

bond, all loss flowing naturally from that fraud may be regarded as its proximate result. Change of conditions may have been a subsidiary cause; it was not an independent cause. The loss sustained is directly traceable to the original misrepresentation of the character of the investment the plaintiff was induced to make.''

In this case that value must be determined in the light of subsequent events. In *Smith* v. *Duffy,* 57 N. J. L. 679, 690, 32 Atl. 371, 372, the court said: ''In cases of this character the true rule of damages is that the wrongdoer must answer for those results, injurious to the other party, which should be presumed to have been within his contemplation at the time of the commission of the fraud. (*Crater* v. *Binninger,* 33 N. J. L. [4 Vroom] 513 [97 Am. Dec. 737]; *Smith* v. *Bolles,* 132 U. S. 125, 10 Sup. Ct. 39 [33 L. Ed. 279].) We think it clear, in the present case, that the defendant must have expected, when he made his fraudulent representation, that the plaintiff would probably retain the stock so long as he believed the representation to be true. The plaintiff did so retain it until the company failed, and during all that time the deceit practiced upon him was effective in controlling his conduct. The loss, therefore, actually resulting from the fraud, and which must be presumed to have been within the contemplation of the defendant, was the difference between the plaintiff's investment and the value of the stock after the fraud ceased to be operative; that is, after the failure of the company. In the ascertainment of this difference the market price of the stock at the time of the sale, or during the year succeeding, or at any time before the failure, was of no importance.'' The facts in this case were almost identical with the facts in the New York case, wherein United States Supreme Court Justice Cardozo, then a member of the New York court, concurred in the decision written by Governor Lehman of New York. It is the duty of a court to endeavor to do justice and equity between the parties.

Now, the law has heretofore never been declared in Montana as to the proof of damages necessary to sustain a verdict where one expressly warrants the bond is secured by a mortgage when it is not, but no less an authority than Oliver Wendell Holmes, later a much respected Associate Justice of the Supreme Court of the United States, when he was Justice of the supreme court of the state of Massachusetts, said in the case of *Whiting* v. *Price,* 172 Mass. 240, 51 N. E. 1084, 70 Am. St. Rep. 262, in effect, that the mere fact that a stock is selling at a certain price before the public knows the true facts about it, does not make that the true value, for it may be merely an illusory value, and that subsequent disclosures may be taken into account in arriving at the true value at the time of sale.

Now, this notorious Insull stock, so far as this record is concerned, became practically valueless. Mr. Gunn, the attorney for the defendant, admitted at the trial and before this court that the books showed that a "thousand dollar bond of this issue was worth only $1.75." It is admitted in the record that the plaintiff, Mrs. Doyle, bought the so-called bond as a permanent investment, that so far as a permanent investment is concerned, it was valueless. Why, then, because it had the trifling value of $1.75 a thousand and the jury did not make that deduction should the plaintiff be deprived of her hard-earned money? The record shows that she depended on Mr. Schuyler for advice. "He took care of my business"; that she was a cook in a section house; that her husband was a cripple, and that she supported the family; that she was busy, and unable to judge of the true value of the bond can be properly inferred from all the testimony. The jury by its verdict found that Mr. Schuyler misrepresented the bond in the following particulars: (a) That the debenture was a secured bond; (b) that it was just as good as a thousand dollar bill; (c) that the owner thereof had a first mortgage on all of the utilities and power companies in Chicago; (d) that the security was the same as if the holder thereof had a first mortgage upon all of

the property of the Montana Power Company; (e) that the bond was secured by property in the value four or five times the value of the debentures outstanding; (f) that the debenture was a safe investment.

The defendant in its brief says: ''While we believe that the trial court committed several errors in its rulings on objections to the evidence and in the matter of instructions, we are *not relying upon any of such errors* to present, for the consideration of this court the single proposition that the verdict is wholly unsupported by the evidence for the reason that there is *no evidence that the plaintiff has suffered any damage for which the defendant is liable.*'' The uncontradicted proof shows that the plaintiff invested $910 cash in a comparatively worthless Insull bond which belonged to the defendant Union Bond & Trust Company. The uncontradicted proof shows that Mr. Schuyler, of the defendant bank, persuaded her to sell her Great Northern bond and with the proceeds thereof to buy this worthless Insull bond belonging to the bank—not a bond ordered by them for her but their own bond. In other words, the bank got rid of a worthless bond that it owned. The jury found that Mr. Schuyler misrepresented the bond as set forth above, and Mr. Gunn admits that for the purposes of this appeal misrepresentations were made by Schuyler, so that the matter needs no further discussion here.

It is true it might be said that the debenture has an insignificant value of from $1.75 to not exceeding $20. The jury did not determine or deduct this value from the amount of the award, probably on the theory that she bought it as a permanent investment and it was worthless as such, interest payments having ceased. This court has, however, repeatedly held that where the amount in which a verdict is excessive is readily ascertainable, this court may grant a new trial unless the plaintiff consents to a reduction in the amount shown to be excessive. In the case of *Thornton* v. *Wallace*, 85 Mont. 27, 30, 277 Pac. 417, 418, the court says: ''Under the circumstances the trial court might properly have given the plaintiffs

the option of remitting the excess, and, if they did so, have permitted the verdict to stand for the residue, instead of granting a new trial (*Chicago Title & Trust Co.* v. *O'Marr,* 25 Mont. 242, 64 Pac. 506 [508]; *Lewis* v. *Northern Pacific Ry. Co.,* 36 Mont. 207, 92 Pac. 469), and where, as in the case before us, it is clear from the pleadings and proof that the plaintiffs are entitled to some relief, and the amount thereof is readily ascertainable from the record, the judgment should not be reversed on account of the error committed not affecting the substantial rights of the defendant, but should be sustained to the extent of the relief to which plaintiffs are shown to be clearly entitled. (Sec. 9751, Rev. Codes 1921; *State* v. *Smart,* 81 Mont. 145, 262 Pac. 158; *Degenhart* v. *Cartier,* 58 Mont. 245, 192 Pac. 259; *Helena & Livingston S. & R. Co.* v. *Lynch,* 25 Mont. 497, 65 Pac. 919.)'' I believe this principle of practice should govern the judgment of this court in this case.

It is decisions such as the majority members of this court are rendering in this action that make the layman lose confidence in courts. Where the wrong done to another is so obvious, for this court to say that there is no remedy brings about a miscarriage of justice. It in effect holds that regardless of the fact that false and fraudulent representations are made by a bank in the sale of bonds and no matter how striking the fraud admitted, if the bonds theretofore having an illusory value at the time of the sale on the market even though the stock is valueless as an investment at the time, still the fraud on the plaintiff is held to be remediless.

I cannot subscribe to such a monstrous doctrine. The question is of such far-reaching importance the bald statement in the majority opinion ''that no values are shown by the proof'' warrants me in extending the argument to quote from the record of the trial of this case, the testimony of Ford Johnson, vice-president of the First National Bank of Helena. The record shows that Mr. Rankin, attorney for the plaintiff, made the statement that ''counsel have agreed that the financial

584

reports of Fitch & Moody may be used as authority in this matter." There was no objection to this statement; therefore we may conclude the defendant agreed to accept Fitch & Moody as authority.

"The Witness: My name is Ford Johnson and I am vice-president of the First National Bank & Trust Company. I was formerly vice-president of the American National Bank. A. C. Johnson, the president of that bank was my father.

"Mr. Rankin: Counsel have agreed that Fitch & Moody may be used as authority in this matter.

"The Witness: You ask me to tell you what the valuation of the Insull Utility Investment Company debentures, Series A. bearing interest at 5% is. I don't know as they quote any value. They quote what somebody might have paid for them.

"Q. That is what I mean. For instance on June 26, 1931, what was the high value given?

"Mr. Gunn: I just want to put in the objection it is incompetent, irrelevant and immaterial.

"The Court: The objection is overruled.

"The Witness: Just quoting from Fitch's bond book, 1932, the price ranged, from January 1, 1929, to January 1, 1932, apparently, quoting from this book, from a high of 97 to a low of 38. That means 38 a hundred or $380, and 97 means $970. For .1932 I have this book here [indicating] as a record of Fitch or Moody, that will show what the high was in 1932. This is Fitch's stock and bond manual. This book shows nothing more than newspaper quotations throughout 1932. The high was 27 and low ½ point.

"Mr. Gunn: May it be understood that—

"Mr. Rankin: You may have the same objection to all of this.

"The Witness: That is $270 on the thousand dollar bond was the high and a half a point on the dollar or $5—no, a thousand dollar bond would be worth $50. It would be 50 cents a hundred or $5 a thousand. For 1935, you ask what the high was. Here is the current Fitch book, May 23, 1935.

Well, the high of 1935, according to this book was 1¾. That means $1.75 a hundred or $17.50 for the thousand dollar bond, I think so. The low apparently was ⅛. I would say that was 12½ cents a hundred or $1.25 for the thousand dollar bond."

In the testimony of Walter Brusch, a witness called by the defendant bank, he testified that he was secretary, assistant trust officer and auditor of the First National Bank of Helena. The following appears in cross-examination by Mr. Rankin:

"A. It is true that Insull Utilities bonds are comparatively valueless, you would get $15 or $20 back for the $900 bond. No one would consider that a good investment.

"Q. Isn't it worth about $1.75 on the $1,000?

"Mr. Gunn: We will agree the books show that."

Surely, this testimony is some proof of value in 1932, the time Mrs. Doyle discovered the fraud. She bought the bond as a safe investment, not as a speculation, relying upon the representations of Schuyler now admitted to be fraudulent. (See *Healy* v. *Ginoff*, 69 Mont. 116, 220 Pac. 539, cited by defendant.)

The measure of damages in this case, where plaintiff relied on defendant's representations thereto, is the difference between the purchase price and the value when the fraud was discovered. Perhaps the term "market value" should be used, although I see little difference as applied to debentures of the type herein. The difference between the value of the assets and the liabilities of the company would furnish some grounds of estimate of value, but these elements were taken into account by the purchaser on the market, with the facts then partially known of the proposed management of the assets, and many other speculative elements that would affect the final disbursements to the debenture holder. The price of the debentures of like issue on the market was the best evidence available for the determination of the actual value.

I make one other observation respecting the majority opinion that strikes a tender spot in my heart. Their opinion states

that Judge Padbury in trying the case in the district court erred in refusing to instruct the jury to bring in a verdict for the defendant bank. The jurymen did not intrude themselves into this case; they came there by order of the court; they listened attentively to the testimony that they might correctly determine the facts. If the judge had ordered them to bring in a verdict for the bank, the verdict would have expressed a lie. It was not their verdict. Such order of the court would have been a cowardly attempt to remove the responsibility of determining the facts which was fixed upon the jury—not the court, by the Constitution. The court under the command of the Constitution invited the jury to determine these facts upon the testimony. The law commanded the court to instruct the jury on the questions of law involved, which it did. It allowed only such testimony as the law permitted. If Judge Padbury had then said to the jury, ''You bring in my verdict regardless of what your conclusions may be,'' I hold that it would have been an insult to the intelligence and honesty of every man on that jury. The jury did bring in a verdict in favor of the plaintiff and in effect found that the bank did abuse her confidence and take her money without right. The bank now refuses to even pay her and seeks to escape upon the flimsy ground that she was unable to prove the actual value of this worthless bond which they induced her to purchase at a price of $910. They now refuse to even pay her a penny and seek to escape upon the flimsy ground that she was unable to prove the *actual value* of this worthless bond at the exact time she bought it, a bond that by false representation they induced her to buy and in order to effect a sale they induced her at the same time to sell a secured Great Northern Railway bond, that the proceeds might be used to pay for this worthless bond.

The statute of Montana, section 9364, Revised Codes 1921, provides: ''Where, upon the trial of an issue by a jury, the case presents *only questions of law*, the judge may direct the jury to render a verdict in favor of the party entitled thereto.'' The citations following this section in the statute clearly and

indisputably show that a directed verdict should be ordered *only* where questions of law are presented. No further citations on this point are needed.

Judge Padbury correctly found that there was an issue of fact to be tried by the jury, and he correctly refused to instruct the jury to bring in a verdict in direct conflict with the undisputed and admitted evidence to the contrary. Accordingly, I especially dissent to this part of the majority opinion which suggests that the district court should have directed a verdict for the bank. One question of fact, the fraud of Schuyler, was saved by Judge Padbury's refusal to direct the jury. It is now admitted by defendant, and is an important fact, that most certainly was correctly submitted to the jury.

Incidentally I suggest that the practice of directing a verdict is a wholly unnecessary and undiplomatic method of deciding a case. The district judge (if he deems the testimony wholly insufficient to support a verdict) can just as well discharge the jury by informing them that there are no facts in controversy for them to determine and then order the case dismissed for failure of plaintiff to prove his case. The self-respect of the jury is then maintained and the same result proposed by the court accomplished. The majority opinion of the court magnifies the technicalities at the expense of justice.

For the foregoing reasons, I most respectfully and emphatically dissent from the opinion of the majority.

---

OPINION ON MOTION FOR REHEARING.

(Filed July 24, 1936.)

MR. JUSTICE ANDERSON delivered the opinion of the court.

It is argued on behalf of the plaintiff that, since the jury found on conflicting evidence on the issue of fraudulent repre-

sentation, plaintiff, even in the absence of any proof of damage, is entitled to have the cause remanded in order to recover at least nominal damages, and that therefore we should not order the case dismissed. In support of their contention that the case should not be ordered dismissed, counsel rely upon certain statements found in the opinion of this court in the case of *State ex rel. La France Copper Co.* v. *District Court,* 40 Mont. 206, 105 Pac. 721, 723. There the court had under consideration the propriety of ordering a dismissal on the merits after it had decided that a motion for nonsuit should have been granted. Following a discussion of the rule applicable to cases involving a motion for nonsuit, the court made this observation: "When a judgment for the plaintiff is reversed for error in refusing to direct a verdict for the defendant, after the former has had full opportunity to introduce all of his evidence, and it appears that his case is not supplemented by the defendant, we apprehend that, even in actions at law, the instances must be rare in which this court will hereafter feel justified in refusing to make a final disposition of the cause."

Among the other cases relied upon is the case of *Broderick* v. *Stevenson Consolidated Oil Co.,* 88 Mont. 34, 290 Pac. 244. There the trial court had tried the cause upon a theory of law announced in a previous decision of this court and expressly overruled by it subsequent to the trial but prior to the appeal then under consideration. The court accordingly held that it was proper to reverse the case and remand it for a new trial. In the equity case of *Hurley* v. *O'Neill,* 26 Mont. 269, 67 Pac. 626, the trial court's order excluding certain testimony rendered it necessary to send the case back for new trial. The case of *Alley* v. *Butte & Western Min. Co.,* 77 Mont. 477, 251 Pac. 517, was remanded for further proceedings, but only to determine the amount of a reasonable attorney's fee; the judgment was otherwise ordered by this court. The case of *Rickards* v. *Aultman & Taylor Machinery Co.,* 64 Mont. 394, 210 Pac. 82, was reversed and the cause remanded for new trial;

it does not, however, appear from the opinion that a motion for a directed verdict was made. Hence, it will be observed, none of these cases involved a question similar to the one now before us. In the case before us the plaintiff was permitted to offer all of her proposed evidence.

Nominal damages would not entitle the plaintiff to recover ▆▆▆ costs under the provisions of section 9787, Revised Codes. The right to recover nominal damages, if no other rights are involved, is not a substantial right, since this court has held that a judgment for the defendant will not be reversed and a new trial granted merely to enable the appellant to recover nominal damages. (*McCauley* v. *McKeig,* 8 Mont. 389, 21 Pac. 22; *Wallace* v. *Weaver,* 47 Mont. 437, 133 Pac. 1099; *Robb* v. *Porter,* 65 Mont. 460, 211 Pac. 210.)

In 8 R. C. L. 426, it is said: "As a general rule nominal damages, as such, are recoverable only in cases where damages are not the gist of the action, that is, in cases primarily designed to secure the plaintiff's right from invasion; and so it is, where the sole object of the action is the recovery of damages, a failure to prove substantial damage is a failure to prove the substance of the issue. In such a case, where there is no inherent personal or property right to determine, the plaintiff is not entitled to nominal damages, even though the evidence might justify a verdict for nominal damages if such right were involved." The following authorities support the text: *Swift & Co.* v. *Newport News,* 105 Va. 108, 52 S. E. 821, 3 L. R. A. (n. s.) 404; *Woodhouse* v. *Powles,* 43 Wash. 617, 86 Pac. 1063, 117 Am. St. Rep. 1079, 11 Ann. Cas. 54, 8 L. R. A. (n. s.) 783; *Lawson* v. *Sigfrid,* 83 Colo. 116, 262 Pac. 1018. The case before us involves no inherent personal or property right. The gist of the action is damages.

Counsel have invited our attention to a few cases containing some general statements which might be construed to be somewhat in conflict with the foregoing rules. In each of those cases, however, an inherent personal or property right was under consideration. Where the gist of the action was dam-

ages, as it is here, a failure to prove actual damages was a failure of proof.

Therefore the motion for rehearing is denied.

ASSOCIATE JUSTICES MATTHEWS, STEWART and MORRIS concur.

MR. CHIEF JUSTICE SANDS, Dissenting: I dissented from the majority opinion handed down several months ago, and I see no reason to retract from my opinion in that case at this late date.

The defendant's attorney concedes that the verdict of the jury is final and binding on this court and that the defendant was guilty of deceiving the plaintiff, Mrs. Doyle, into believing that she was buying a secured bond when in fact it is now conceded that the bond was not secured. The majority opinion setting aside the verdict is based upon the sole ground that the value of the bond at the time of purchase was not established by sufficient evidence. There is ample proof that the bond was issued by a holding company with only a gambler's chance on the success of the several operating companies; that this fact was concealed from Mrs. Doyle when she purchased the "safe investment," and when the fact came to her notice the bond "was worthless." She furnished the best proof available. She was not required to prove how many of the gambling companies were still able to deceive their stockholders and prospective stock purchasers into believing they were solvent. The sale was made by the bank as one of the members of a bankers' syndicate organized to sell these Insull securities.

I liken the case to a bankers' organization to fleece purchasers into buying glass diamonds by taking advantage of the confidence imposed in them. The plaintiff here is denied redress because it is claimed she has not proved the value of the fake diamond at the exact time she purchased. She should have subpoenaed other glass diamond vendors to prove the value of this particular glass diamond at this particular time.

I dissent from the opinion of the majority and hold that the proof was amply sufficient to support the verdict of the jury, and, furthermore, that the Constitution prohibits this court from setting aside the verdict of a jury on questions of fact.