Iɴ ʀᴇ NELSON ᴇᴛ ᴀʟ.

(No. 7,558.)

(Submitted April 1, 1936. Decided July 23, 1936.)

[60 Pac. (2d) 365.]

*Mr. Wellington D. Rankin* and *Mr. S. C. Ford,* for Contemnor.

*Mr. Raymond T. Nagle,* Attorney General, and *Mr. Jeremiah J. Lynch,* for the State.

### Opinion: PER CURIAM.

This in an original proceeding seeking to hold the Western Progressive Publishing Company, a corporation, and John W. Nelson, the president, editor and general manager of the newspaper published by the corporation and known as the Western Progressive, in contempt of court.

Following the publication of an article appearing in the Western Progressive published on March 13, 1936, this court submitted the publication in question, together with the opinion of this court in the case of *Doyle* v. *Union Bank & Trust Co.,* 102 Mont. 563, 59 Pac. (2d) 1171, theretofore promulgated on March 4, 1936, and to which the published article referred, to the office of the Attorney General, with a request for investigation to determine whether the article so published was in contempt of this court. On receiving an opinion from that office holding that the article was contemptuous, this court directed the Attorney General to file proceedings against these parties for contempt. Thereupon, a sworn affidavit was filed by the Attorney General, and a citation was ordered issued out of this court directing the defendants to show cause, after notice given, if any they had, why they should not be punished for contempt of this court.

The defendants appeared in obedience to this citation, and filed their separate written returns admitting most of the allegations found in the affidavit filed by the Attorney General. A hearing was had before this court, at which the defendant John W. Nelson was present in person and represented by counsel who also represented the other defendant. Witnesses were called by the Attorney General and examined by him and cross-examined by counsel for the defendants. Certain documents were also offered in evidence and by the court received as such. The Attorney General sought to call the defendant John W. Nelson as a witness, but on objection being made by the defendant Nelson himself and by his counsel, claiming his constitutional privilege according to him the right not to be compelled to testify against himself, this court denied the request of the Attorney General to have this defendant sworn or examined as a witness. At the close of the hearing counsel for the defendants, and also the Attorney General, declined to argue the case unless the court so requested, and no request being made by the court, the cause was submitted for judgment and decision without oral argument or briefs.

The Attorney General in his affidavit alleged his official capacity, and the incorporation of the Western Progressive Publishing Company in the month of January, 1932, under the laws of the state of Montana. He further alleged that the Western Progressive since the 11th day of January, 1932, had been a newspaper printed and published on Friday of each week in Helena, and that weekly, and particularly on the 13th day of March, 1936, it had a circulation in Lewis and Clark county and throughout the state of Montana in excess of 5,000 copies; that the Western Progressive Publishing Company owned and published the paper known as and called the Western Progressive; that on the 13th day of March, 1936, and for a year prior thereto, John W. Nelson was the president of the defendant corporation, and the editor and manager of the newspaper published by it; that on the 10th day of August, 1934, Julia Doyle, plaintiff, filed a complaint in the district

court of Lewis and Clark county against the Union Bank & Trust Company, a corporation, wherein she prayed for judgment for the sum of $910 and costs; that the defendant answered in that action, and that the cause came on for trial on June 10, 1935, before the district court of Lewis and Clark county sitting with a jury; that on June 13, 1935, a judgment was rendered in that action in favor of Julia Doyle and against the defendant therein, for the sum of $910, with interest and costs, amounting in all to $1,093; that on September 9, 1935, the defendant bank appealed to this court from the judgment, and that on February 10, 1936, that cause was argued before this court, and thereafter on March 4 the court rendered its opinion. All of the foregoing allegations are admitted in the separate returns made by the defendants. No affirmative pleading is made in either return to any of the foregoing allegations, with the exception that it is alleged that the Western Progressive on March 13, 1936, had a circulation between 12,000 and 13,000 copies.

Before proceeding to a review of the allegations with reference to the opinion in the case of *Doyle* v. *Union Bank & Trust Company,* it is well to observe that it is altogether improper at this time to enter into a discussion of the merits of that cause or the soundness of the opinion of the court there rendered, since the cause is now pending before this court on a petition for rehearing. It is only proper to make such reference thereto as is necessary to demonstrate the falsity and gross inaccuracy of the publication assuming to report the proceedings of this court.

The affidavit of the Attorney General then contains an exact copy of the majority opinion of this court. It is disclosed from the opinion that the action of *Doyle* v. *Union Bank & Trust Company* was brought to recover damages alleged to have been suffered by the plaintiff therein, and to have resulted from the purchase by her from the defendant bank of a debenture for the sum of $910 in the month of November, 1929. Her action was grounded upon alleged false and fraudulent representations in the sale of this debenture. The precise ques-

tion for decision in that case was whether there was any evidence in the record as to the actual value of the debenture at the time of the sale by the bank to Mrs. Doyle.

We said in that opinion, in declaring the measure of damages there applicable, as follows: "This court, in the case of *Healy* v. *Ginoff*, 69 Mont. 116, 220 Pac. 539, said that the measure of damages for fraud inducing the purchase of property is 'the difference between the actual value of the property at the date of sale and the contract price.' In the case of *Rickards* v. *Aultman & Taylor Machinery Co.*, 64 Mont. 394, 210 Pac. 82, it was said that the measure of damages for breach of a warranty in the sale of personal property was the difference between the value of the thing sold if it had been as warranted, and its actual value at the time of the sale. The trial court instructed the jury that the measure of damages was the difference between the value of the debenture which plaintiff obtained and the value of that debenture would have been had it been as represented." It appears from the opinion in that case that the price paid for the debenture was the then market value, and that the market value of the debenture after the purchase continued to be the price paid, or slightly above that price, for a considerable period of time. We there held, in accordance with the contention of the plaintiff in that case, that since the plaintiff had bought this debenture for investment, the market value at the time of its purchase was not controlling. In the opinion we then made the following comment upon the market value of the debenture as evidence of the actual value at the time of its purchase: "If the market value at the time of the sale is an unsafe guide as to the actual value of corporate security, it must logically follow that the market value some three years or more later is likewise no evidence of the actual value at the time of the sale. If an optimistic market value is unsound, then a depressed market value is no better." The opinion then contains, on the last page near the conclusion, the following: "As we view the situation here, there was no proof before the court as to what the actual value of the debenture might have been at the time of

the sale. It is argued on behalf of the plaintiff that to compel her to offer some proof as to the actual value of the thing sold at the time of the sale is tantamount to denying to her the right of recovery. The question of the actual value of the debenture was something on which expert witnesses could have expressed an opinion. However, plaintiff's remedy by way of an action for damages was not the only remedy available to plaintiff, if she was defrauded. On discovering the alleged fraud, by offering to restore the property purchased, she would have been entitled, if she could have maintained her allegations as to fraud, to a return of the consideration for the purchase, without any proof as to the actual value of the debenture at the time of the sale; however, she elected to retain the debenture and sue for damages."

The returns admit the promulgation of the opinion as set forth in the affidavit of the Attorney General, and allege that the Chief Justice filed a dissenting opinion to the majority opinion of the court.

The affidavit of the Attorney General then alleges that on March 13, 1936, while that cause was still pending in this court, and while the decision was still under the control of this court and subject to revision, the defendants printed and published a certain article, a copy of which, omitting the dissenting opinion of Chief Justice Sands, is attached as an exhibit; the pertinent part of this exhibit being as follows:

"Four Supreme Court Judges Uphold Bank's Fraud. Bankers who practice fraud upon their old clients and customers, cannot be reached for damages when the fraud is discovered. So ruled four justices of Montana's supreme court this past week in one of the most sensational decisions subverting the rights of innocent investors, ever written into the records of a Montana court. The four judges in effect said that any customer or client of a bank who relies upon the bankers' statements in purchasing securities, cannot come back upon that banker for damages if subsequently it is discovered

that the statements were lies and the deal conceived and executed in fraud.''

The defendants admit the publication of the article as alleged, but in the separate return of the defendant Nelson it is asserted that he had no information or knowledge that the cause was still pending in this court, and that he believed the opinion as promulgated was final. He also affirmatively alleges that no other person or persons knew of the article prior to its publication, and that no one aided, assisted, or encouraged the writing of the publication, or was in anywise responsible for the writing, printing and publication of the article.

It is alleged in the affidavit of the Attorney General and admitted by both defendants, that the article was published of and concerning this court, and that on March 13, 1936, the defendants caused the newspaper containing the article to be extensively circulated in Lewis and Clark county and throughout the state of Montana. It is then alleged in the affidavit that the article in question reflected upon the honor, integrity, and purity of the supreme court, and was designed, intended and calculated to hold this court and certain Justices thereof up to public opprobrium and to incite public contempt for the court; that it was intended and calculated to embarrass this court in the final disposition of the cause, and to obstruct the due administration of justice with reference thereto, and was an unlawful interference with the proceedings of this court. Also, it is alleged that the article was a false and grossly inaccurate report of the decision and proceeding of this court in the case of *Julia Doyle* v. *Union Bank & Trust Company*. These and similar allegations to the same effect were specifically denied by the defendants, and it was affirmatively alleged that the article and the dissenting opinion of Chief Justice Sands, which was a part of the article, were a fair and accurate report of his dissenting opinion.

Lewis Penwell, Collector of Internal Revenue for the District of Montana, was called as a witness and testified that he

founded the Western Progressive in 1932; that no stock of the corporation was issued for a considerable period of time, other than qualifying shares of the directors; that persons who had contributed to the enterprise were later issued stock in some proportion to the contributions theretofore made; and that he continued in charge of the paper until approximately a year and a half prior to the date of the hearing. Inquiry was made of him as to whether he had sought and solicited contributions and the signing of pledge cards to make monthly contributions in the sum of $10 per month, from two of the then and now members of this court in the late spring and early fall of the year 1933, to which he responded that he did not recall such solicitations, but conceded that they might have been so made by him. The two members of this court testified as to the solicitations made by Mr. Penwell, who at the time of the alleged solicitations was the managing head of the publication. He testified that recently, in some manner unknown to him, the defendant John W. Nelson had secured, and was now the owner of, a majority of all the stock in the corporation at the time of the hearing. The secretary of the corporation was called as a witness and disclaimed any responsibility for the activities and policies of the paper. A former vice-president of the corporation, who had very recently resigned, testified that during his incumbency of that office he had nothing to do with the activities and policies of the paper.

Over the objection of counsel for the defendants, the Attorney General offered certain other issues of the Western Progressive containing articles relating to this court. In the issue of June 22, 1934, received in evidence, appeared an editorial commenting upon the decision of this court in the case of *State ex rel. Nagle* v. *Stafford*, 97 Mont. 275, 34 Pac. (2d) 372, as follows: ''The most surprising part of the decision is the conclusion of Erickson's reappointment of Stafford during a recess of the senate was valid but that Governor Cooney's appointment of Bruce during a recess was invalid. It is difficult for lawyers, and many times more difficult for the layman

52

to understand the distinction. Why should not Governor Cooney, who under the constitution is performing all the duties of Governor, be deprived of a right which the supreme court says Governor Erickson had?'' Also, in the issue of February 7, 1936, another article appears, the pertinent part of which is as follows: ''Motion to Strike is Denied by Supreme Court Justices. Members of the state supreme court denied the motion of attorneys of Judge W. B. Sands to strike the brief of E. G. Toomey, Montana Power Company attorney, in the case attacking Judge Sands' election, although the language used in the corporation's brief is among the most contemptible and insulting ever leveled against the judiciary of Montana.'' Other issues of this publication, both prior and subsequent to the publication in question, were received in evidence, but we think it unnecessary to make specific reference to them, as those already alluded to will be sufficient for the purposes of this opinion.

Subdivision 7 of section 10944, Revised Codes 1921, defines as criminal contempt ''the publication of a false or grossly inaccurate report of the proceedings of any court.'' In the case of *State ex rel. Metcalf* v. *District Court*, 52 Mont. 46, 155 Pac. 278, Ann. Cas. 1918A, 985, L. R. A. 1916F, 132, this court said: ''The right to punish for contempt is as old as the law itself. It is a power inherent in the courts of record of this state, is a part of their very life, and a necessary incident to the exercise of judicial functions. (*Territory* v. *Murray*, 7 Mont. 251, 15 Pac. 145; *In re Mettler*, 50 Mont. 299, 146 Pac. 747; *State ex rel. Boston & Mont. etc. Min. Co.* v. *Clancy*, 30 Mont. 193, 76 Pac. 10.) The legislature of this state has never undertaken to abridge the powers of the courts created by the Constitution to punish any act which would constitute contempt at common law. In section 7309 [now 9908], Revised Codes, certain acts are denounced as contempts, but that the enumeration was not intended to be exclusive is manifest, for in section 8275 [now 10944] other acts are referred to as constituting contempts, which are not mentioned in section 7309.''

Much is said in the dissenting opinion of the Chief Justice relative to the desirability of jury trials in contempt proceedings. It clearly appears from what this court said in the opinion from which we last quoted, supra, that no attempt has been made by the legislature to curb the power of the courts to punish for contempt. No provision is found in our statutes or Constitution for trial by jury in proceedings of this character. Section 10944, Revised Codes, defining criminal contempts was first enacted by the legislature in 1895, and has remained unchanged. Sections 9908–9921, relating to the subject of contempt, were all enacted long prior to statehood; their first passage dates back to the earliest territorial days; they have been carried forward unchanged through many revisions and codifications of our statutory laws. That the constitutional convention had before it for consideration the subject of contempts is made manifest by the provisions limiting the power of the legislature to punish for contempt; however, no such limitation on the power of the courts to punish for contempt is found in the Constitution. If the statutory law on the subject is thought not to express sound and wise principles of law, the people, by the legislature, have the power to amend the statutes; and if the people find that their duly-elected representatives are not in accord with their views on the subject, the power of the initiative reserved in the Constitution to them, may be exercised at their command to obtain the same result; and if it is found necessary in order to prevent the exercise of this power by the courts that a constitutional amendment is necessary, appropriate machinery is found in the Constitution to accomplish that purpose. Hence no reason exists for these observations in the dissenting opinion, except to record the views of the author on this subject as to what he believes might be a wise change in existing law. His appeal should properly be addressed to the law-making bodies; it has no place here. The law-making power is by the Constitution vested in the legislature, with the power of veto in the Governor, and, as above noted, in the people under the initiative;

none of these powers were by that document vested in the office of the Chief Justice, and for him to attempt to exercise them is an unwarranted usurpation and unconstitutional exercise of legislative power.

This court, at the time of the publication, still had jurisdiction of the *Doyle Case*. Under its rules (XX) the remittitur does not issue until a petition for rehearing, if filed, has been disposed of, or until the time within which it may be filed has elapsed. Under the rules which have been in force for many, many years, a period of ten days is allowed for the filing of a petition for rehearing, and at the time of the publication in question that period had not expired. These views are in accord with those declared in the early case of *State ex rel. Haskell* v. *Faulds,* 17 Mont. 140, 42 Pac. 285, 286, wherein it was written: "This court obtained jurisdiction of the cases by appeal. It did not part with that jurisdiction as long as no remittitur had been issued returning the case to the district court. In *Kimpton* v. *Jubilee Placer Mining Co.,* 16 Mont. 379, 41 Pac. 137, 42 Pac. 102, on petition for rehearing, this court held that it had jurisdiction until the remittitur had been issued."

The defendants herein will undoubtedly give to the dissenting opinion the wide publicity its author intends it to have; we therefore desire to point out a few of the fallacies therein: The power to grant rehearings is inherent in appellate courts, and is exercised by the Supreme Court of the United States and the supreme courts of states throughout the Union. (See 4 C. J. 621, and many cases cited.) "A cause is pending within the rule of contempt concerning libelous publications when it is still open to modification * * * or rehearing." (13 C. J. 36, citing many cases.)

While any false or grossly inaccurate report of the proceedings of a court published is punishable as a misdemeanor (sec. 10944, Rev. Codes 1921), such publication is punishable as a contempt of court only when published while the cause is still pending. (*State ex rel. Haskell* v. *Faulds,* supra; *State*

*ex rel. Metcalf* v. *District Court,* 52 Mont. 46, 155 Pac. 278, Ann. Cas. 1918A, 985, L. R. A. 1916F, 132.)

When, as here, the publication is concerning a decision of the court, this inherent power of the court is invoked for the salutary purpose of deterring publishers from seeking in this manner to influence the court to change its decision before the remittitur goes down. (*People* v. *News-Times Pub. Co.,* 35 Colo. 253, 84 Pac. 912; *Patterson* v. *Colorado,* 205 U. S. 454, 27 Sup. Ct. 556, 51 L. Ed. 879, 10 Ann. Cas. 689.)

The defendants strenuously objected to the reception in evidence of the additional publications. The only purpose for which they were admitted was for the purpose of establishing intent. This court has frequently held in criminal cases, where intent is a material element of the crime charged, that it is relevant to prove the commission of other crimes of like nature committed either before or after the act for the commission of which the defendant is on trial. (*State* v. *Simanton,* 100 Mont. 292, 49 Pac. (2d) 981; *State* v. *Hall,* 45 Mont. 498, 125 Pac. 639.) The same rule has been applied in cases of criminal contempt by other courts. (*State* v. *Howell,* 80 Conn. 668, 69 Atl. 1057, 125 Am. St. Rep. 141, 13 Ann. Cas. 501; *Davidson* v. *Commonwealth,* 213 Ky. 221, 280 S. W. 970; *In re MacDonald,* 110 Pa. Super. 352, 168 Atl. 521.) Clearly, under these authorities, the publications made in the same paper of and concerning the same court and its decisions were admissible for the purpose of corroborating the proof of intent.

It is suggested that there might have been some impropriety in two members of the court testifying in this proceeding. In the first place, their testimony related only to the question of intent; and in the second place, it was undisputed. This court has repeatedly held that the testimony of a witness that he does not remember whether a certain event took place does not contradict in any degree positive testimony that it did occur. (*Maynard* v. *Bara,* 96 Mont. 302, 30 Pac. (2d) 93; *Gallaher* v. *Theilbar Realties,* 93 Mont. 421, 18 Pac. (2d) 1101;

*Lindblom* v. *Employers' Liability Assur. Corp.*, 88 Mont. 488, 295 Pac. 1007; *Lasby* v. *Burgess,* 88 Mont. 49, 289 Pac. 1028.)

Furthermore, our statute expressly authorizes a judge to testify in a cause. Section 10537, Revised Codes 1921, reads as follows: "The judge himself, or any juror, may be called as a witness by either party; but in such case it is in the discretion of the court or judge to order the trial to be postponed or suspended, and to take place before another judge or jury." An identical statute was given a like interpretation in the Oregon case of *State* v. *Houghton,* 45 Or. 110, 75 Pac. 887. In fact, courts have approved, in the absence of statutory authority, a trial judge's testifying in a felony case where there was only one presiding judge. (*McCaffrey* v. *State,* 105 Ohio St. 508, 138 N. E. 61.) In Wigmore on Evidence, second edition, section 1909, the author, after enumerating all of the objections which have been raised to trial judges' testifying in causes over which they are presiding where the statute does not expressly authorize the giving of such testimony, makes the following observations: "But in the ordinary instance the judge's testimony is desired for merely formal or undisputed matters, such as the proof of execution of a certificate or of the administration of an oath or of a deceased witness' former testimony. To suppose here a danger that the inconveniences above noted would occur in any appreciable degree is to be unduly apprehensive. Military commanders do not train cannon on a garden-gate; and the law of Evidence need not employ the cumbrous weapon of an invariable rule of exclusion to destroy an entire class of useful and unobjectionable evidence in order to avoid embarrassments which can easily be dealt with when they arise. Since the trial judge has no interest to subject himself or counsel or jury to these supposed embarrassments, it may be properly left to his discretion to avoid them, when the danger in his opinion arises, by retiring from the bench before trial begun or by interrupting and postponing the trial and securing another judge."

It will be recalled that the defendant Nelson in his sworn return asserted that he had no intention to treat the court with contempt; but he offered no evidence in support of those allegations, and he was unwilling to submit those statements to the acid test of cross-examination. This court, however, at an early date held in the case of *Territory* v. *Murray,* supra, that the effect of such a disclaimer was not conclusive. There the court said: "The defendant disclaims in his affidavit any intention to treat the court with the slightest contempt in publishing said telegram; but the court is not bound by such disclaimer, but may inquire into the truth of the matter. 'The meaning and intent of the defendant in publishing the dispatch must be determined by a fair interpretation of the language used.' 'The construction and tendency of the publication, as bearing upon its character as a contempt, are matters of law for the court.' (*Henry* v. *Ellis,* 49 Iowa, 205; *People* v. *Wilson,* 64 Ill. 195 [16 Am. Rep. 528]; and also numerous authorities cited in the latter case.)"

It is frequently asserted that contempt proceedings as against the press invade the constitutional right of freedom of speech. We cannot improve upon what was said by this court in the case of *State ex rel. Haskell* v. *Faulds,* supra, nor cite better authority than that from which it quoted. In that case, Chief Justice Pemberton, speaking for the court said: "But it becomes appropriate to notice this contention further, for the reason that, in their argument, the able counsel for respondent dealt eloquently and at length upon the constitutional liberty of the press, which they claim is involved in the case. This court is not less mindful of the importance and absolute necessity of maintaining the freedom of the public press than the eloquent counsel themselves, if we would preserve the liberties of the people and republican institutions and government in this country. Section 10, Art. III, of the Constitution of this state provides 'that no law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being

responsible for all abuse of that liberty.' While this section of the Constitution secures the largest liberty to the press, it also imposes responsibilities. It is a statute of liberty, not of 'licentious scandal.' The liberty of the press is one thing, the 'abuse of that liberty' is quite another. (*People* v. *Stapleton* [18 Colo. 568] 33 Pac. 167 [23 L. R. A. 787].) We cannot better express our views of this most important subject than by appropriating the language of the court in *State* v. *Morrill* [16 Ark. 384], quoted above,—an able and exhaustive opinion on the freedom of the press in this country. The court in that case, after speaking of the limited powers of the legislature to punish contempt, says:

" 'But the fact that the convention which framed the Constitution had the subject of contempts before them, placed a limitation upon the power of the two houses to punish contempts [see Art. V, sec. 11, Montana Constitution], but did not think proper to place any such limitation upon the power of the courts, warrants the conclusion that the courts were left to exercise such common-law powers on the subject as, in their sound discretion, might be found necessary to preserve their authority, and enforce their legal process, orders, judgments, and decrees, without which they could not answer the purposes of their creation. And there is a good reason why the framers of the Constitution might well have made this distinction. The legislature is a political body. If its proceedings and the conduct and motives of its members are unjustly assailed by libelous publications, they may defend their official conduct, and repel attacks through the press, and upon the "stump;" but it is not the usage of the country, nor would it comport with the dignity of judicial stations, for judges to resort to newspapers or the public forum in defense of the integrity of their decisions, etc., and it would be an unwise policy that would drive them to such a course. * * * Any citizen has the right to publish the proceedings and decisions of this court, and, if he deem it necessary for the public good, to comment upon them freely, discuss their correctness, the fitness or un-

fitness of the judges for their stations, and the fidelity with which they perform the important public trusts reposed in them; but he has no right to attempt, by defamatory publications, to degrade the tribunal, destroy public confidence in it, and dispose the community to disregard and set at naught its orders, judgments, and decrees. Such publications are an abuse of the liberty of the press, and tend to sap the very foundation of good order and well-being in society, by obstructing the course of justice. * * *

" 'The liberty of the press is one thing, and licentious scandal is another. The Constitution guarantees to every man the right to acquire and hold property, by all lawful means; but this furnishes no justification to a man to rob his neighbor of his lands or goods. * * * ''The true liberty of the press is amply secured by permitting every man to publish his opinions; but it is due to the peace and dignity of society to inquire into the motives of such publications, and to distinguish between those which are meant for use and reformation, and with an eye solely to the public good, and those which are intended merely to delude and defame. To the latter description it is impossible that any good government should afford protection and impunity.'' The argument of counsel that the Constitution and laws having provided for the punishment of libels by indictment renders it wholly unnecessary for the courts, in any instance, to treat them as contempts, as well remarked by the Attorney General, if it proves anything, proves too much; because, if a man resist the process of a court, or enter the courthouse, and assault the presiding judge, he may be punished by indictment therefor, and yet no one questions the power and duty of the court to punish such acts as contempts.' ''

Thomas Jefferson, the author of the Declaration of Independence, and during his long and useful career a strong adherent to, and advocate of, the freedom of the press, after his election to the presidency wrote to John Norvell: "It is a melancholy truth that the suppression of the press could not

more completely deprive the nation of its benefits than is done by its abandoned prostitution to falsehood.'' And again this great liberal said of unreliable newspapers, that one who never looks in such a newspaper ''is better informed than he who reads them, inasmuch as he who knows nothing is nearer the truth than he whose mind is filled with falsehood and error.'' (See *United States* v. *Toledo Newspaper Co.*, (D. C.) 220 Fed. 458, 507.)

The article in question, from which we quoted in the beginning, proclaims that this court has said that where a banker has committed fraud upon a customer, the customer cannot recover. The quotations from the opinion in question clearly reveal that this court neither directly nor indirectly, expressly or impliedly, made such ruling. We there said that the plaintiff, in order to recover damages, must prove the actual value of the thing purchased at the time she bought it, and the difference between the actual value and what she paid for it is the amount she is entitled to recover. We there said that plaintiff did not prove the actual value, and that therefore the judgment could not be sustained. We furthermore pointed out that in cases of that character, if the proof of the actual value was found difficult, an action could be brought wherein, on the establishment of fraud and an offer to restore the thing purchased, recovery of the full purchase price could be had without any proof as to the actual value.

One of the members of this court has, in a dissenting opinion appended hereto, assumed a position of extreme sympathy and grave concern for the unfortunate woman who was the plaintiff in the case of *Doyle* v. *Union Bank & Trust Co.*, supra. As we pointed out in the majority opinion of the court in that case, and also herein, she had at her command adequate proof to make a sufficient case for the rescission of her contract of purchase, had she offered to restore the debenture upon the repayment of its purchase price, and thereby probably enable her to recover the full amount paid for the debenture. This she did not elect to do. The cause of action was her own

property to do with as she pleased. She proposed to retain the debenture and recover the full purchase price in addition. In the case of *Richli* v. *Missoula Trust & Savings Bank,* 54 Mont. 127, 168 Pac. 41, 42, this court said: "In the domain of the law, as elsewhere, 'One cannot eat his cake and have it too.' " Her choice of remedies was of her own making. Errors of judgment on her part or on the part of her counsel in selecting a remedy are their own and not those of the court as the dissenting member would lead those to believe who may chance to scan the pages of his opinion or the newspaper for whose pages it was written.

We have called attention to the article published in the same paper during the time when Lewis Penwell was connected with its affairs. An examination of the opinion in the case of *State ex rel. Nagle* v. *Stafford,* supra, reveals that no such holding as was attributed to this court was made in that decision. Mr. Penwell admitted on the witness-stand that, although he no longer owned any stock in the corporation, he was still a creditor for a very substantial amount, amounting to approximately $4,000. Although perhaps in the early part of 1936 his guidance of the policy of the paper had been somewhat weakened, nevertheless its policy was unchanged. We find in the issue of February 7, 1936, from which we have quoted, a positive statement that this court had denied a motion in a proceeding pending before it. That motion has not to the day of the writing of this decision been ruled upon, either adversely to the movant or otherwise.

In the case of *State* v. *Shumaker,* 200 Ind. 623, 157 N. E. 769, 775, 162 N. E. 441, 163 N. E. 272, 58 A. L. R. 954, it was said of publications concerning the supreme court of Indiana, when considering a statute identical to our own quoted, supra: "For us to pass unnoticed conduct unquestionably intended and calculated to arouse public prejudice against the judges in the performance of their judicial functions, thus destroying the faith of the people in the judiciary and respect

for the law, would be so cowardly that it would be contemptible and a disgrace.''

In the case of *In re Fite,* 11 Ga. App. 665, 76 S. E. 397, 404, the court said: ''The possession of this power and its exercise in proper cases are essential to the maintenance of the respect due to the courts as representatives of the majesty of the people, entrusted by them with the high and sacred responsibility of passing upon the rights and liberties of the citizen, in the administration of law and justice. If courts fail to enforce respect, if they do not strive to preserve their independence and to maintain inviolate their judicial integrity, they will not only lose their own self-respect, but will be recreant to the duty they owe to the state. * * * Pernicious attacks of this character not only impede and embarrass the due administration of law and justice by the courts, but are calculated to inflame public anger, and arouse public prejudice and clamor against the judges in the performance of their judicial functions. The power of the judiciary rests upon the faith of the people in its integrity and intelligence. Take away this faith, and the moral influence of the courts is gone, and respect for the law is destroyed. Other departments of the government may outlive unjust criticism, and may still render service to the people, even when unfairly assailed; but when confidence in the courts is gone, respect for the law itself will speedily disappear, and society will become the prey of fraud, violence and crime. The one element in government and society which the people desire above all things else to keep free from the taint of suspicion is the administration of justice in the courts.''

Again, in the case of *State* v. *Schumaker,* supra, the court made some very appropriate observations upon the powers and duties of courts, as follows: ''It is true that courts are not the masters of the general public or of any part of the general public, not even of a single individual; but it is equally true that courts are not organized to decide questions of law according to the wish of the power to appoint, or to elect or

otherwise. Courts in this country are subservient to the Constitution of the United States, the Constitution of this state, and to the established law of the land only, and to no other earthly power. It would be monstrous if any political party or any body or association of people, having the power to elect or defeat judges, could control or dictate decisions of courts. This condition would exist if courts were the servants of those holding the power to elect. In determining a question presented for decision, a judge is not free to act in accordance with his personal wishes, desires or predilections for the reason that judicial action must be controlled by a consideration of law, only as applied to the facts of the particular case. The judge must determine what the law applicable to the case is and he must apply the law to the facts and the result of this process will determine the decision. A decision thus reached is what the law requires, and is not necessarily what may meet with the approval of any person or class of persons who may be directly or indirectly interested in the result. So long as we have courts composed of men who have integrity and courage sufficient to enable them to follow the law as the sole guide to judicial action, we shall have a government of law and not a government of men. It may be that a decision so reached may not meet with general public approval, but courts should be indifferent to any consideration of that nature. The trend and weight of public opinion and sentiment on questions of importance is subject to change; but sound legal principles founded on reason and justice should never change. It is, therefore, apparent that courts cannot be the servants of the people in the sense that they must conform their decisions to meet the desires of any class or even of a majority of the people.''

The duty imposed upon a court in a proceeding of this kind is far from pleasant. If, however, we are to have a government of law, as distinguished from a government of men, the judiciary must declare the law as written. The legislature has declared that a false or grossly inaccurate publication of the

64

decision of a court is criminal contempt. A comparison of the published article in question with the opinion of the court in the case of *Doyle* v. *Union Bank & Trust Company* establishes beyond question of a doubt the fact that, to put it mildly, the publication was grossly inaccurate. The other publications to which we have referred come within the same class. The examination of all these articles, together with the testimony to the effect that the defendant Nelson, before the article was published, had before him a copy of the *Doyle* v. *Union Bank & Trust Co.* opinion, leads to the irresistible conclusion that the contempt was intentional.

It has been suggested that this court has in the past overlooked contemptuous publications by other newspapers arising out of reports of the decisions and permitted the offenders to go unpunished. It may be that some inaccuracies have obtained in such reports, but none that may be characterized as grossly inaccurate, aside from those mentioned in this opinion, have been called to the attention of this court. The members of this court who are endeavoring to perform their duties are without the time and inclination to scan the columns of the press meticulously in search of possible contemptuous publications. Let him who proclaims their existence direct the attention of this tribunal to the articles of which he complains, if any, and proper consideration will be given to any such publications without regard to the source from which they emanate. All are equal before the law, and none above it.

It is intimated that some reports with reference to dissenting opinions have been contemptuous. Those, however, who have begun the study of law and pursued it for a brief period of time with reasonable diligence, soon become aware of the fact that dissenting opinions are not the opinions of the court, but the views of the individual judge writing them. They are the stones which the builders have rejected.

In the case of *State ex rel. Metcalf* v. *District Court,* supra, this court quoted with approval from 6 Ruling Case Law, 512, as follows: "At common law the mere writing contemptuously

of the judge of a superior court was a constructive contempt. * * * The common-law rule was founded on the obsequious and flattering principle that a judge was the representative of the king, but the theory of government which invests royalty with an imaginary perfection, and which forbids question or discussion, is diametrically opposed to the principles of a free and popular government." Again, in the same opinion this court, speaking of the publication there before it for consideration and alleged to have been contemptuous, said: "If it offends, it is because it libels the judge and scandalizes the court; but the offense of 'scandalizing the court,' as understood at common law, is unknown to our jurisprudence."

For the libel of the individual judge there exists a remedy, either by civil or criminal action. (*State ex rel. Metcalf* v. *District Court*, supra.) Contempt is to the court and not to the individual judge who is one of five members of the court.

We must therefore hold the defendants guilty of contempt as charged. It is the order of this court that in accordance with this finding of guilt they appear before this court for the pronouncement of judgment on the 24th day of July, 1936, at 2 P. M.

ASSOCIATE JUSTICES MATTHEWS, ANDERSON, STEWART and MORRIS concur.

MR. CHIEF JUSTICE SANDS, Dissenting: This is an action in contempt. The Progressive Publishing Company, a corporation, and John W. Nelson, who is the president, editor, and general manager of the newspaper published by the corporation called the "Western Progressive," are each charged with the contempt of this court by the publication of the article appearing in the "Western Progressive" published on March 13, 1936, entitled, "Four supreme justices uphold bank fraud."

The article deals with the decision of this court in the case of *Doyle* v. *Union Bank & Trust Company*, 102 Mont. 563, 59 Pac. (2d) 1171, in an action wherein the plaintiff sought to re-

cover damages for false representations of the defendant in selling her an Insull debenture bond. The first part of the article briefly purports to state the substance of the case and the opinion of the four Justices of the court. It is followed by the dissenting opinion of Chief Justice W. B. Sands. The alleged contempt refers exclusively to the portion of the article preceding the quoted dissenting opinion of Judge Sands, and consists of the following: "Bankers who practice fraud upon their old clients and customers cannot be reached for damages when the fraud is discovered. So ruled four justices of Montana supreme court this past week in one of the most sensational decisions subverting the rights of innocent investors ever written into the records of a Montana court. The four judges in effect said that any customer or client of the bank who relies upon the banker's statement in purchasing securities cannot come back upon that banker for damages if subsequently it is discovered that the statements were false and the deal conceived and executed in fraud."

It will be observed that the statement does not purport to be a quotation from either the majority or minority opinion, but is the conclusion of the writer as to what was decided by the two opinions. In this connection let it be observed that the writer is merely a layman and not a lawyer or judge, and he assumed the very dangerous province of stating the results reached in the opinion of the court; results that the best lawyers often construe very differently. Frequently, newspapers quote certain portions of a supreme court decision technically correct; but it is quoted very unfairly, in this, that certain portions of the opinion are left out that are necessary to fairly present the case in question.

Newspapers hold a very important and fiduciary relation to the public, inasmuch as the public presumes and has a right to expect that the decision of the court has been fairly presented. Those who have followed the daily newspaper reports of Montana decisions well know how unfairly and unjustly many of the supreme court decisions have been presented to

the public, particularly cases that involved big financial interests. The facts stated in the opinion are usually not incorrectly stated, but the facts required to fairly present the poor man's side are suppressed and the substance of the poor man's side of the controversy thereby misjudged by the public.

Information concerning court proceedings is presented to the reading public almost exclusively by the big daily newspapers. The "Western Progressive," a weekly paper, stepped aside from its usual procedure and attempted in this instance to publicize this opinion of *Doyle* v. *Union Bank & Trust Co.* The printing of both the majority and minority opinions would probably have been too long for their complete publication. Therefore, the editor contented himself with a brief statement of the majority opinion and copied the dissenting opinion of Judge Sands in full. A reading of the two opinions taken as one prompted the brief statement in the forepart of the article. The writer was undoubtedly prejudiced against the bank on account of the injury resulting to a poor woman by very plausible representatives of the bank, which representations were found by the jury to be fraudulent. The defense of the bank was that in the presentation of the case at the trial in the district court the plaintiff failed to prove damages, and this court in its majority opinion determined that such proof of damages was not technically sufficient. In fact, the decision was that there was no proof of damages, and therefore the opinion condemned the district court for not ordering the jury to bring in a verdict for the defendant. The writer of the objectionable article, Nelson, the defendant, evidently was impressed with the logic of the dissenting opinion which quoted the testimony at length respecting the damage feature of the case. Nelson was honest in his belief that damages were established as found by the jury.

The majority opinion in the present case deals eloquently with the freedom of the press as guaranteed by the Constitution. I heartily agree with this opinion in their comments along this line. However, the alleged contemptuous language

of the article here complained of is exceedingly mild and fair when compared with the false and libelous statements of court cases published so frequently by the daily press.

Particular exception is taken by the majority of the court to the headline, "Four supreme court judges uphold bank's fraud." It is a well-known fact that a story cannot be told in its entirety in the headline, but when the opinion and dissenting opinion in this case are analyzed, it seems to me that the layman can come to no other conclusion than that four members of this honorable body were in fact upholding the fraud of the bank. In fact, that is what the majority opinion in the *Doyle Case* did, and that is exactly what I had in mind when I said in my dissenting opinion, "I cannot subscribe to such a monstrous doctrine." In other words, the court adopted the technical argument of the defendant bank which to all practical purposes defeated recovery; otherwise, nominal damages at least should have been given for the conceded misrepresentation and fraud of the bank. Again, the majority opinion finds fault with the statement in the objectionable article, "Bankers who practice fraud upon their old clients and customers cannot be reached for damages when the fraud is discovered." I say now that the majority opinion, when taken in connection with the quoted testimony found in the dissenting opinion, fully justified that comment, and that the layman, reading the two opinions, could come to no other conclusion.

In the majority opinion in the *Doyle Case,* it is said: "Evidence was produced in support of these allegations [referring to the allegations of fraud practiced by the bank] on behalf of the plaintiff, and on behalf of the defendant denying the truth of the same. It is conceded that the verdict of the jury is conclusive on the question of the fraudulent representations." In other words, the court said that while it is conceded that the fraudulent representations found by the jury to have been made by the bank to the plaintiff, were made as charged, the bank cannot be reached for damages when the fraud is discovered. If

the stock had an illusory market value at the time of sale it might be and in fact was worthless as a permanent investment.

In my dissenting opinion I quoted at some length the fraudulent representations made by Schuyler to Mrs. Doyle, and in commenting upon that testimony I said: "In other words, the bank got rid of a worthless bond that it owned. The jury found that Mr. Schuyler misrepresented the bond as set forth above, and Mr. Gunn admits that for the purposes of this appeal misrepresentations were made by Schuyler, so that the matter needs no further discussion here."

Again in the dissenting opinion it is said that it is decisions such as the majority members of this court are rendering in this action that make the layman lose confidence in courts where the wrong done to another is so obvious, for this court to say that "there is no remedy," brings about a miscarriage of justice. It in effect holds that regardless of the fact that false and fraudulent misrepresentations are made by a bank in the sale of bonds having only an illusory value in fact at the time of the sale on the market even though the stock is valueless as an investment at the time, still the fraud of the plaintiff is held to be remediless. How, then, in view of this language, could this layman come to any different or other conclusion than that four members of this court were upholding the fraud committed by the bank, and that "bankers who practice fraud upon their old clients and customers cannot be reached for damages when the fraud is discovered."

It was brought out at the hearing that it is not an unusual practice for newspapers to comment editorially and in news items upon the decisions of this court before the time for filing the petition for rehearing has expired. Indeed, the witness (Associate Justice) Stewart testified that in the case of *Boepple* v. *Mohalt,* 101 Mont. 417, 54 Pac. (2d) 857, the "Helena Independent" published an article commending the majority opinion in that case and condemning in no uncertain terms the writer of the dissenting opinion, the Chief Justice of this court.

It was also brought out that while this editorial was called to the attention of this court and likewise called to the atten-

tion of the Attorney General, no action against the "Helena Independent" has been taken. The fact that the editorial in the "Independent" was favorable and commended the majority of the court for the decision rendered would not make it less contemptuous, for the favorable comment might prevent the plaintiff in that action from obtaining a rehearing and might influence the majority members of the court in denying Mrs. Boepple's petition for rehearing. Again, the same witness testified regarding an article appearing in the "Helena Independent" criticizing the Chief Justice of this court in another recent decision, but as in the former case no action has been or will be taken against the "Helena Independent" for the publication of that criticism. I do not quarrel about that, but if we are going to spend our time threatening everybody that criticizes this court or its members, let us remember that what is sauce for the goose is sauce for gander. Let us show no partiality and make our friends come under the same rule as our enemies.

The late President Teddy Roosevelt widely commended the practice of publishing and criticizing court decisions, but he very emphatically impressed his view that these criticisms should be fair and honest. I am opposed to make fish of one and fowl of the other. I do not believe that because the "Western Progressive," an independent newspaper which publishes articles or has adopted a policy with which the members of this court do not agree, struggling to survive the opposition leveled against it by the well-known powerful corporate influences of the state, should be punished and that the "Helena Independent," a newspaper adequately financed which commends the members of the court who are writing the majority opinion in this case, and which paper is supporting the said powerful interests that in a large part dictate the policy of the state, should not only go untouched but be defended by the Attorney General and the members of this court.

Judges should not be too thin-skinned nor conclude that because of the high positions they occupy they are not to be

criticized for their official acts. No court has ever maintained, nor will any court ever maintain, the respect to it by clubbing and browbeating and by penalizing the men who criticize them, but such respect can be established and maintained only by the soundness and fairness of decisions and the principles of justice therein enumerated. If we as judges do our duty conscientiously, do equity and justice, we do not need to fear whether or not there is adverse criticism of our actions. Time and the sober judgment of the people will eventually reach a fair analysis and conclusion by the people. When we permit a poor working woman with a crippled husband to be legally robbed of her savings on the most technical of technical grounds, then we must expect criticism, indignation and disrespect of our opinion.

Chief Justice John Marshall did not become the greatest American jurist by sending those men to jail or punishing them for contempt who did not show him the proper deference, but by his great impartiality, fairness and courage, his fearless interpretation of the law, and the enunciation of those great principles of justice which have proven to be the foundation for our governmental structure. The strength of courts lies in the fact that the judges thereof are unmindful of public opinion, and therefore if we are so thin-skinned that we cannot "take it," or that we are influenced by any article which may appear in the newspaper or any "puff of wind," then we may properly be designated as the "five irascible old men," and we should resign and permit courageous men not thus easily influenced to administer justice for this tribunal. If we are to find these defendants guilty for publishing an article such as that in question, then by these same tokens every statement made against the court on the street corner is contemptuous. Are we going to cite into court every man or woman or newspaper who criticizes the court in its decisions? Such a rule or course of conduct smacks too much of Hitler and Mussolini to meet with my sense of fairness and justice. I cannot and will not subscribe to it.

I have long thought that there should be jury trials in contempt cases not committed in the immediate presence of the court, and the proceedings in this case have fortified me in that conclusion. Here two of the Justices of this court saw fit to remove their judicial robes and take the witness-stand as witnesses on behalf of the prosecution and tell of personal differences between them and one connected with the ''Western Progressive'' some three years prior, and then pass judgment upon the weight of their own testimony. I never liked the idea of a judge being prosecutor, judge and jury in contempt cases, but in the case before us we have unfortunately an added element which makes the practice worse. Here two members of this court, Judges Stewart and Anderson, are not content with being prosecutors, judges and jury, but in their zeal to find the defendant guilty of contempt of this court have become witnesses to personal transactions three years old with one whose connection with this paper was severed over eighteen months ago and who is not a party defendant to this action. In other words, they become prosecutors, witnesses, court and jury, all in one.

It is decisions such as this rendered in the *Doyle Case* and this proceeding as well that are bringing the courts into disrepute and causing the layman to lose confidence in them; proceedings such as here conducted on the hearing in this cause will do more to hold this court and the members thereof up to public opprobrium, will do more to incite public contempt, will do more to create a feeling in the minds of the people of the state of Montana that the court is partisan, than all of the articles which may be published criticizing the court for decisions it may render in the next decade. In view of the dissenting opinion and the prevailing newspaper headline practices, the article published was on the whole a fair report of the proceedings of this court in the *Doyle Case*, even though the headline may have followed too closely the statements influenced by the dissenting opinion. The most prejudiced mind

cannot say the publication is a *false or grossly inaccurate report*.

Section 10944, Revised Codes, reads: "Every person guilty of any contempt of court, of any of the following kinds, is guilty of a misdemeanor: * * * 7. The publication of a *false or grossly inaccurate* report of the proceedings of any court." The punishment for a misdemeanor is a fine of not over $500, or six months in jail, or both. This remedy for a "false or grossly inaccurate report" of the proceedings of this court was available to the members of this court or any of them, and should have furnished an adequate remedy if they, or any of them, deemed the article "false or grossly inaccurate," and would have left the guilt to be determined by an impartial jury instead of by the prosecutors themselves acting as such jury. Justices of the supreme court are no more entitled to protection than other citizens. Surely the common juror should be able to decide whether Nelson made *false or grossly inaccurate* statements. The jury verdict would carry with it respect for law and the feeling that the common citizen had rights protected by the Constitution and by the public authorities whose first duty under the Constitution is to protect *all* of the people. This remedy is still available, whatever the verdict of the members of this court. Mr. Nelson may be subjected to two punishments for this same offense. Why not dismiss this partisan proceeding and substitute the verdict of a nonpartisan jury? It is not too late.

Section 16 of Article III of our Constitution provides: "In all criminal prosecutions the accused shall have * * * a *speedy* public trial by an *impartial jury*." Have these defendants had a speedy trial? This case was heard on April 5th. Many cases of less importance have been heard and decided since that hearing. Why the unusual delay? Can this court ignore the express mandate of the law? Courts by refining and technically construing the law have placed themselves upon a pedestal far above the common citizen and now ignore this and other vital provisions of our fundamental law

that every judge is required to swear to protect and defend. Does it not look as if this court was in this instance unwilling to trust a jury where their personal interests are concerned? There is no law authorizing this tyrannical procedure. There is a well-defined statutory and adequate criminal procedure, and also a statutory well-defined civil action that affords ample protection to every judge of this court, two contempt remedies; therefore, this court is without authority or occasion to invent a special procedure for this case, a procedure that transgresses the most fundamental principles of liberty, fair trial, and free press.

Our Constitution, section 10, Article III, also provides: "No law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty." If any court can assume to itself the power to prosecute, testify and determine the question of whether or not any publication is libelous, what further use have we for that fancied protection of our constitutional rights? By this proceeding the boasted equality of all citizens before the law is wafted to the winds by the very officials that should be the most respected of all officers of this state, the Justices of the supreme court; officers that are presumed to be the most impartial. Again let me urge that this action be abandoned and replaced by a trial by an impartial jury.

But there is, in my opinion, another unanswerable reason why this case should be dismissed; a reason not heretofore advanced or argued. The defendants are charged with publishing this article while the case was still before the court. I call attention to the fact that the decision in the *Union Bank Case* had been rendered and filed before the publication of the alleged contemptuous article. It is claimed a motion for rehearing was pending; such was not the case. The motion for rehearing was not filed until after the publication of the alleged contemptuous article. There was no statute authorizing a rehearing of the bank case. The rehearing motion was based

solely upon a *rule of this court*. The rule for rehearing is of doubtful authority, and in any event should not constitute notice to these defendants that a motion for rehearing could or would be made. Newspapers assume the decision to be final and publish reports of cases in which the opinions are without reference to the time within which motions may be made for rehearing. It is conceded that if the action in the bank case was not pending at the time of the publication of the alleged contemptuous article then this court had no jurisdiction to bring this proceeding.

If newspapers are required to take notice of a rule of court authorizing a rehearing and all orders extending the time for filing such motions (a frequent practice), then the right of comment, the time when comment may safely be made, is made so burdensome that it practically restricts publication of comment, particularly to newspapers not having ready access to the supreme court records. The practical effect of such court rule is to nullify that provision of the Constitution which assures the right of free speech. Since there is no law extending the time and no proof that the defendant knew the time for final action had been extended, his criminal intent in commenting on the *Doyle Case* was not proved; therefore, the publication in question of this court decision could not give this court jurisdiction, and for this reason as well as the reason that the article was not contemptuous, the defendant cannot be found guilty. There is no statute authorizing this summary action to be heard before this court by the members of the court as the jury in the case; the alleged contempt referred to a case not then pending before the supreme court and was wholly beyond the jurisdiction of this court. I therefore insist the proceeding should be dismissed.

I call attention in particular to the very pertinent case of *State ex rel. Metcalf* v. *District Court*, supra, and append three extracts from cases in other jurisdictions therein quoted with approval: "The publication by this relator is hardly susceptible of classification as a report of court proceedings. If it

offends, it is because it libels the judge and scandalizes the court; but the offense of 'scandalizing the court,' as understood at common law, is unknown to our jurisprudence, particularly since the adoption of the Constitution, and ample provision is now made for redress for libel, by civil action. The supreme court of Kansas has said [*In re Pryor*, 18 Kan. 72, 26 Am. Rep. 747] : 'No judge, and no court, high or low, is beyond the reach of public and individual criticism. After a case is disposed of, a court or judge has no power to compel the public, or any individual thereof, attorney or otherwise, to consider his rulings correct, his conduct proper, or even his integrity free from stain, or to punish for contempt any mere criticism or animadversion thereon, no matter how severe or unjust.' * * *

"The supreme court of North Carolina has recently receded from the position taken in the *Moore Case* [63 N. C. 397] above. While challenging the authority of the legislature to destroy or sensibly impair the power of a court to punish for contempt, the court treated a recent statute of that state upon the subject of contempt as follows: 'Having reference to the history of this statute, the context, and the language employed, it was clearly the purpose and meaning of the Act to restrict the power of the court, in this last respect, to the publication of grossly inaccurate reports about a trial or other matter *still pending*, and, this being in our view *the proper and only permissible occasion for the exercise of such a power in reference to these publications*, we are of opinion that the provision of the statute should, in this respect, be upheld as written, and the power to punish summarily for defamatory reports and criticisms, *about a matter that is past and ended, no longer exists.*' (*In re Brown*, 168 N. C. 417, 84 S. E. 690.) In 6 Ruling Case Law, 512, the modern American doctrine is tersely stated as follows: 'At common law the mere writing contemptuously of the judge of a superior court was a constructive contempt, but this doctrine has not been fully adopted in this country and has been limited by our constitutional guar-

anties of free speech and liberty of the press to pending cases.'
\* \* \*

"The most cogent reason exists for restraining a false publication concerning matters *pending in court,* where the administration of the law may be impeded or justice actually defeated, and the interests of the publc are sufficiently involved to warrant classifying such a contempt as a crime. But we cannot believe that the legislature ever intended to denounce as a crime every false or grossly inaccurate report concerning causes *finally determined,* when no public interest can suffer as a consequence of the publication. If it be contempt of court and a crime to publish a false report concerning a cause finally decided a week or a month ago, the offense is equally as great if the false report concerned the proceedings taken in the most trivial cause a year ago."

Cause taken to Supreme Court of the United States on appeal.

---

Note.—At the time fixed in the opinion of the majority of the court for pronouncement of judgment, a fine of $250 was imposed upon the Western Progressive Publishing Company; contemnor John W. Nelson being sentenced to imprisonment in the county jail of Lewis and Clark county for the term of one day. Petition for appeal to the Supreme Court of the United States was at once presented in behalf of John W. Nelson, allowed and bond for $300 filed. On January 27, 1937, contemnor Nelson in open court stated that his appeal to the United States Supreme Court had been abandoned, offered his apology for his transgression of its rules, and petitioned the court for a remission of the jail sentence imposed upon him; whereupon the court ordered that such sentence be remitted and stricken from the judgment.